# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

**WARREN F. NELSON**

       Plaintiff,

    v.

**AEON Management, LLC**
708 North 1st Street
Minneapolis, MN 55401

**AEON Property Management, et al.**
901 North 3rd Street, Suite 150
Minneapolis, MN 55401

**Crane Ordway Limited Partnership**
dBA Crane Ordway Apartments et al.
281 E 5th Street
St. Paul, MN 55101

**EPG Security Group,**
2928 North 2nd Street,
Minneapolis, Minnesota 55411

**Corinna Lowe, Aeon Crane Ordway,**
Portfolio Director

**Jamal Abdirahman, Aeon**
Crane Ordway, Site Manager

**Scott Redd, Vice President of Resident,**
Aeon Crane Ordway, Connections, and supportive Services

**Shanon Ployhart, CPM, COS**
Aeon Crane Ordway, Portfolio Director

**Marsha Lidgerding, Aeon**
Crane Ordway, Site Manager

**Colin Burkholder, Aeon**
Crane Ordway, Assistant Site Manager

**Defendant A, (last name unknown) Tenant of Apartment Unit**
405, Aeon Crane Ordway Tenant Representative

**Defendant B (last name unknown) Tenant of Apartment Unit 302**

**Defendant C (Name unknown) Tenant of Apartment Unit 201**

**Kelly Hawkinson, Tenant of Apartment Unit 101**

       **Defendant (s).**

Case No. 18 cu 2436 Jnt/SER

Judge

# COMPLAINT
# 42 U.S.C. § 1983.



SCANNED
AUG 20 2018
U.S. DISTRICT COURT MPLS

COME NOW, Plaintiff, for his cause of action against Defendant (s), states and alleges that:

## PARTIES

1.          Plaintiff, Warren F. Nelson was and is a resident of the State of Minnesota whose current address is Salvation Army, Harbor Lights, Emergency Shelter, 1010 Currie Ave., 2nd Floor, Minneapolis, MN 55403. prior address was 281 E. 5th Street, Apartment 202, St. Paul, MN 55101 is a resident of the State of Minnesota and was at the time subjected to Discrimination, Harassment, Retaliation, Defamation, of alleged herein.

2.          Defendant, AEON Property Management, at all times material, was and continues to be a Minnesota Limited Liability Company, with its principal place of business located at 901 North 3rd Street, Suite 150, Minneapolis, MN 55401. AEON Property Management, a Limited Liability Company authorized to conduct business and conducting business in the State of Minnesota, and was at the time subjected Plaintiff to Discrimination, Harassment, Retaliation, Defamation, of alleged herein.

3.          Defendant, AEON Management, LLC, at all times material, was and continues to be a Minnesota Limited Liability Company, with its principal place of business located at 708 North 1ST Street, Minneapolis, MN 55401. AEON Management LLC, a Limited Liability Company authorized to conduct business and

conducting business in the State of Minnesota, and was at the time subjected Plaintiff to Discrimination, Harassment, Retaliation, Defamation, of alleged herein.

4. Defendant, Crane Ordway Limited Partnership dBA Crane Ordway Apartments at all times material, was and continues to be a Minnesota Limited Partnership, with its principal place of business located at 281 East 5th Street, St. Paul, MN 55101 and is a partnership company with Aeon Property Management LLC located at 901 North 3rd Street, Suite 150, Minneapolis, MN 55401. Crane Ordway apartments, and Crane Ordway Limited Partnership, a company authorized to conduct business and conducting business in the State of Minnesota, and was at the time subjected Plaintiff to Discrimination, Harassment, Retaliation, and Defamation, of alleged herein.

5. Defendant, EPG Security Group, at all times material, was and continues to be a Minnesota Corporation with its principal place of business located, at 2928 North 2nd Street, Minneapolis, Minnesota 55411, and is a company authorized to conduct business and conducting business in the State of Minnesota, and was at the time subjected Plaintiff to Discrimination, Harassment, Retaliation, and Defamation, of alleged herein.

6. Defendant, Corinna Lowe, Supervisor and Portfolio Director of the Crane Ordway Apartments, at all times material, is an employee of Aeon

Management Property was and continues to be an employee of Aeon Property Management, with its principal place of business located at 901 North 3rd Street, Suite 150, Minneapolis, MN 55401. AEON Property Management, a Limited Liability Company authorized to conduct business and conducting business in the State of Minnesota, and was at the time subjected Plaintiff to Discrimination, Harassment, Retaliation, and Defamation, of alleged herein.

7.      Defendant, Shanon Ployhart, Supervisor and Portfolio Director of the Crane Ordway Apartments, at all times material, and was an employee of Aeon Property Management, with its principal place of business located at 901 North 3rd Street, Suite 150, Minneapolis, MN 55401. AEON Property Management, a Limited Liability Company authorized to conduct business and conducting business in the State of Minnesota, and was at the time subjected Plaintiff to Discrimination, Harassment, Retaliation, and Defamation, of alleged herein.

8.      Defendant, Scott Redd, AEON Vice President of Resident connections, and supportive services of the Crane Ordway Apartments, at all times material, is an employee of Aeon Property was and continues to be an employee of Aeon Property Management, with its principal place of business located at 901 North 3rd Street, Suite 150, Minneapolis, MN 55401. AEON Property Management, a Limited Liability Company authorized to conduct business and conducting business in the State of Minnesota.

9.        Defendant, Jamal Abdirahman, AEON On-Site Manager of the Crane Ordway Apartments, at all times material, is an employee of Aeon Property Management, and Crane Ordway Apartments, was and continues to be an employee of Aeon Property Management and Crane Ordway Apartments, with his principal place of employment at  281 E. 5th Street, Saint Paul, MN 55101, Crane Ordway Apartments is under the umbrella of AEON Property Management, a Limited Liability Company authorized to conduct business and conducting business in the State of Minnesota, and was at the time subjected Plaintiff to Discrimination, Harassment, Retaliation, and Defamation, of alleged herein.

10.       Defendant, Marsha Lidgerding, Aeon, Crane Ordway, On-Site Manager of the Crane Ordway Apartments, at all times material, was an employee of Aeon Property Management, and Crane Ordway Apartments, "was" an employee of Aeon Property Management and Crane Ordway Apartments, with its principal place of business 281 E. 5th Street, Saint Paul, MN 55101, Crane Ordway Apartments is under the umbrella of AEON Property Management, a Limited Liability Company authorized to conduct business and conducting business in the State of Minnesota, and was at the time subjected Plaintiff to Discrimination.

11.       Defendant, Colin Burkholder,  Aeon, Crane Ordway, Site Manager of the Crane Ordway Apartments, at all times material, is an employee of Aeon Property Management, and Crane Ordway Apartments, was and continues to be an employee

of Aeon Property Management and Crane Ordway Apartments, with its principal place of business 281 E. 5th Street, Saint Paul, MN 55101, Crane Ordway Apartments is under the umbrella of AEON Property Management, a Limited Liability Company authorized to conduct business and conducting business in the State of Minnesota, and was at the time subjected Plaintiff to Discrimination.

12.     Defendant, Rose, (last name unknown) tenant of Unit 405, **now identified as Defendant A,** at all times material, is a Tenant of Crane Ordway Apartments, was and continues to be a tenant at the Crane Ordway Apartments, with her principal place of residence at 281 E. 5th Street, Apartment 405, Saint Paul, 55101, in the State of Minnesota, and was at the time subjected Plaintiff to Discrimination, Harassment, Retaliation, and Defamation, of alleged herein.

13.     Defendant, Richard (last name unknown) tenant of Unit 302, **now identified as Defendant B,** at all times material, is a Tenant of Crane Ordway Apartments, was and continues to be a tenant at the Crane Ordway Apartments, with his principal place of residence at 281 E. 5th Street, Apartment 302, Saint Paul, 55101, in the State of Minnesota, and was at the time subjected Plaintiff to Discrimination, Harassment, Retaliation, and Defamation, of alleged herein.

14.     Defendant, tenant of Unit 201, (Name unknown), **now identified as Defendant C,** at all times material, is a Tenant of Crane Ordway Apartments, was

and continues to be a tenant at the Crane Ordway Apartments, with her principal

place of residence at 281 E. 5th Street, Apartment 201, Saint Paul, 55101, in the State

of Minnesota, and was at the time subjected Plaintiff to Discrimination, Harassment,

Retaliation, and Defamation, of alleged herein.

15.        Defendant, Kelly Hawkinson, tenant of Unit 101, at all times material,

is a Tenant of Crane Ordway Apartments, was and continues to be a tenant at the

Crane Ordway Apartments, with her principal place of residence at 281 E. 5th

Street, Apartment 101, Saint Paul, 55101, in the State of Minnesota.

### JURISDICTION AND VENUE

16.        This action is brought by the Plaintiff to enforce the Fair Housing Act,

Title 42 U.S.C. 1981. 42 U.S.C. § 1983. 42 U.S.C. 1988. Title VI of the Civil Rights

Act of 1964. Title VIII of the Civil Rights Act of 1968 (Federal Fair Housing Act of

1968) and the federal Fair Housing Act Amendments Act of 1988. 24 CFR 100.600.

(quid pro quo harassment and hostile environment) Title 42 › Chapter 126 ›

Subchapter IV › § 12203 (Prohibition against retaliation and coercion) Section 109 of

Title Housing and Community Development Act of 1974, Executive Order 11063.

Minnesota Statute Chapter 363A. Minnesota Statute 363A.15 (Reprisals). 42 U.S.

Code § 1981.

17.        This Court has jurisdiction over this matter pursuant to 28 U.S.C. ï½§

1345. 42 U.S.C. ï½§ 3614 and 42 U.S. Code § 3613 (a)(1)(A)(B)(2)

## BACKGROUND

18.          Plaintiff faced years of long term homelessness prior to 2016 and found

shelter and assistance through the Salvation Army's Harbor Lights, located at 1010

Currie Ave., Minneapolis, MN 55403. An advocate by the name of Damein Poling, an

employee and advocate at Harbor Lights, was able to submit a referral to Emmanuel

House, RS Eden for transitional housing program funded by the State of Minnesota

Hennepin county program called GRH, an abbreviation for Group Resident Housing.


19.          In the month of September 2017, Plaintiff began to look for normal

housing where there was less restriction as exist in GRH programs and sought out

Aeon who is a property management LLC Limited Liability Company, and Crane

Ordway Partnership dba Crane Ordway Apartments who participates in government

funded housing programs through Emergency Solutions Grants Program (ESG)

under Title 24 CFR part 578 implemented to erase Long-Term Homelessness

Program (HTF/ELHIF) for families and single adults. (Refer to Exhibit 1)


20.          Aeon Property Management LLC Limited Liability Company, and Aeon

Property Management, and Crane Ordway Partnership dba Crane Ordway

Apartments receive funding subsidies, and Tax incentives from both, The State of

Minnesota, and the executive branch of the Federal government, United States

Housing Urban Development, (HUD) through appropriations and funding. The

Defendants also rent to working employed tenants who pay normal rent from wages earned.

## FACTS

21.        In the whole month of October 2016, Plaintiff made numerous calls in which voice mails were left for Marsha Lidgerding, Aeon Crane Ordway Site Manager at the Crane Ordway Apartments to please call me regarding occupancy. Phone records can substantiate this. In all there were approximately several calls made.


22.        10/26/2017, finally, Plaintiff was able to make contact with Marsha Lidgerding through email, in which an appointment was scheduled on 10/28/16. (Refer to Email-Exhibit 1)


23.        Email dated 10/28/16, at 11:00 am, Plaintiff went to scheduled appointment which was agreed upon with Marsha Lidgerding, Aeon Crane Ordway Site Manager at the Crane Ordway Apartments, located at 281 East 5th Street, St. Paul, MN 55101. When Plaintiff got to the location, the office was closed. Plaintiff then walked over the Crank Ordway Apartment's sister location apartment building called the Renaissance Apartments, also referred to as Red Box apartments located at 200 10th street, St. Paul, MN. Both offices at both locations were closed, and no one called or emailed Plaintiff that appointment had been cancelled. Plaintiff travels from Emmanuel House located at 818 S 3rd St, Minneapolis, MN 55415. Plaintiff have to manage a monthly fixed (GA) General Assistance monthly stipend of $97.00 per

month and cannot afford to pay public transportation to appointments that are not kept. (Refer to Email Exhibit 1, page 1)

23a        10/26/16, Plaintiff confirmed appointment. (Refer to Email Exhibit 2, pages 2-5)

24.        11/03/16, at approximately 9:00 am, Plaintiff again commuted over to both locations and again they were closed all morning and early afternoon. Plaintiff looked up the address to the parent corporate office property management company called Aeon located at 901 N 3rd St #150, Minneapolis, MN 55401. When Plaintiff met with the receptionist, Plaintiff insisted that he speak to a manager. Plaintiff was met by Shanon Ployhart, CPM, COS, Aeon Crane Ordway, Portfolio Director. Plaintiff provided her with a current criminal background printout from the St. Paul Police Department, Records Department located at 367 Grove St, St Paul, MN 55101. She had me fill out a rental application in which I completed and emailed back to her the next day.

25.        Email dated 11/03/16, from defendant Shanon Ployhart, whereas she requested additional information pertaining to offenses occurred on 5/2012 and 8/2013 but were not adjudicated until 2/12/2015. Plaintiff explained to her that because attorney for Plaintiff and Defendant allowed the cases to fall through the

cracks of the judicial system. These cases were not resolved until 2015. (Refer to Email-Exhibit 4, page 8)

26.        Email dated 11/03/16, later that afternoon Marsha Lidgerding, Aeon Crane Ordway Site Manager at the Crane Ordway Apartments contacted Plaintiff only after Shanon Ployhart emailed her. Whereas Marsh Lidgerding emailed leasing application to Plaintiff. .

27.        11/08/16, Plaintiff finally met with Defendant Marsha Lidgerding at the Crane Ordway Apartment locations. The Defendant indicated that the apartment she currently showing Plaintiff would be the unit Plaintiff would be occupying. The apartment shown was long in length and had a mattress located on a second level. When we entered apartment, there was a coat area, then the bathroom, front living room area, then the kitchen, then a stair case of about perhaps 6 or 7 stairs leading to a second level where the bedroom area was located. Standing from the doorway, the apartment would best be described as studio vertical apartment in designed. (Refer to Exhibit 1) *Note: The unit shown was similar in design to apartment shown in exhibit 1 but was smaller.*

28..       Email dated 11/03/16 Plaintiff submitted and emailed completed application to both defendant (s) Shanon Ployhart, and Marsha Lidgerding. (Refer to Email Exhibit 3, page 6-7 )

29.         Email dated, 11/17/16, two weeks later, email was received whereas receipt of application was acknowledged, though application was submitted on 11/03/16, requesting application fee from a person unknown to Plaintiff by the name of Mai Nesha Cyrus. (Refer to Email Exhibit 5, page 9-10)

30.         Email dated 11/17/16, Plaintiff submitted an email to Paul Rheingans explaining that there is an app fee of $35. Paul was asked since Aeon's corporate office is based in downtown Minneapolis, shouldn't Plaintiff be eligible for help? Also, Plaintiff have forwarded the email received from their corporate office in Minneapolis. (Refer to Email Exhibit 5, page 9)

31.         Email dated 11/17/16, Plaintiff's advocate from the Salvation Army GRH program Paul Rheagan's, Salvation Army Center GRH Case Manager, indicated that they could pay the $35 app fee. (Refer to Email Exhibit 5, page 9-10)

32.         Email dated 11/18/16, Paul Rheagan informs Ms. Mai Nesha Cyrus, the application fee will be paid by the Salvation Army, Case Worker for Warren Nelson. (Refer to Email Exhibit 5, page 10)

33.         Email dated 11/18/16, Mai Nesha Cyrus indicates that she has been in contact with Paul Rheagan. (Refer to Email Exhibit 5, page 10)

34.        Email dated 11/20/16, Marsha Lidgerding acknowledges that she has met with South Metro on 09/18/16 regarding LTH unit at the Crane Ordway. Plaintiff has no ideal what she is referring to since rental Application was only completed and emailed to Shanon Ployhart and cc to Marsha Lidgerding on 11/03/16. See paragraph 28. (Refer to Email Exhibit 6, page 12))

35.        Email dated 11/21/16, Plaintiff informs Marsha that Ms. Mai'Nesha Cyrus, Aeon Assistant Site Manager, at 612-338-3118, is in the process of collecting the application fee, which is being paid by the Salvation Army Harbor Lights, and that Paul has indicated that he has touched bases with Ms. Cyrus regarding the fee and that the application process will be moving forward. (Refer to Email Exhibit 6, page 11)

36.        Plaintiff also forwarded prior correspondences with Ms. Cyrus for your review. Please correspond with Ms. Cyrus to confirm that application fee is in process. Also, if you could Ms. Lidgerding, confirm that you have received these updates.

37.        Email dated 11/21/16, Mai Nesha Cyrus indicates to Plaintiff that Marsha and she were a little confused on the situation. She also stated that if application is approved, Plaintiff could be accepted into their apartments. Then Plaintiff was asked if he no longer wanted to live there? She stated further that, it doesn't make sense for her to process your application if that is not where you will

want to go. "<u>At this time, I'm not sure if your application will be approved because the background check has not come back yet.</u>" (Refer to Email Exhibit 7, page 14)

38.     Email dated 11/21/16, to Mai'Nesha, she appears unaware that the application fee is being paid the Salvation Army and that you have already begun the app process. Please notify her that FEE of $35 for the app process has been paid. I still very much want the apartment. (Refer to Email Exhibit 7, page 15)

39.     Email dated 11/21/16, She informs Plaintiff that Marsha is aware of the application fee, and she works at a completely different site than Marsha does. Would you like to still keep your application at her property, being that she can get you approved once your background gets approved? The whole ordeal appeared to confuse Plaintiff being that I was only trying to get into the Crane Ordway Apartments (Refer to Email Exhibit 7, page 16)

40.     Email dated 11/21/16 email was sent by Plaintiff to Mai'Nesha Cyrus regarding application. (Refer to Email Exhibit 7, page 16)

41.     Email dated 11/21/16, email was sent to Mai'Nesha, Marsha, and Shanon. Paul Rheingans and Plaintiff were under the impression that because all the property is a part of Aeon management and that one application is all that would be

needed and that only one application fee is needed. (Refer to Email Exhibit 7, page 16)

42        Email Dated 11/21/16, in reply it was stated that Plaintiff did not see any point in paying a $35 application fee at her location where there is no apartment available. Or there is a waiting list. The apartment that is available is at the Crane Apts., that is what Paul at the Salvation Army thought we were paying the $35 application fee for. (Refer to Email Exhibit 7, page 16-17)

43.        No correspondences during the whole month of December 2016 were made between Plaintiff and Defendants pending full background check finalization necessary for application approval.

44.        Email dated 01/04/17, Plaintiff made inquiry into the status of the approval process 49 days later to Defendant Marsha Lidgerding (Refer to Email Exhibit 7, page 18)

45.        01/09/17, Plaintiff emailed Defendant Shannon Ployhart with inquiry informing her that I had emailed Defendant Marsha Lidgerding inquiring about status of Plaintiff's application approval five days ago and no return acknowledgement had been received and requested her assistance to intercede in the matter. (Refer to Email Exhibit 8, page 19)

46.      Email dated 01/13/17, Defendant Shannon Ployhart requested additional information on 5th degree assault in 2015 and supporting documentation. (Refer to Email Exhibit 8, page 20)

47.      Email dated 01/14/17, Plaintiff responded to Defendant Shannon Ployhart request concerning additional information on the 5th degree assault. (Refer to Email Exhibit 8, page 21)

48.      Email dated 01/14/17, Plaintiff submitted correction to previous response. (Refer to Email Exhibit 8, page 22)

49.      Email dated 001/16/17, Plaintiff requested confirmation that requested update information was received by Defendant Shannon Ployhart. (Refer to Email Exhibit 8, page 22)

50.      Email dated 01/16/17, Acknowledgement of email receipt from Defendant Shannon Ployhart. (Refer to Email Exhibit 8, page 22)

51.      Email dated 01/17/17, Plaintiff again made inquiry into the status of the approval status concerning occupancy. (Refer to Email Exhibit 10, page 27)

52.        Email dated 01/23/17, Defendant Marsha Lidgerding acknowledged that
application was approved on the background check. (Refer to Email Exhibit 16)

53.        Email dated 01/24/17, Plaintiff reminded Defendant Marsha Lidgerding
about her statement concerning the final step toward move in Defendant's previous
email. (Refer to Email Exhibit 10, page 26)

54.        Email dated 01/25/17, Defendant Shannon Ployhart inquired if Plaintiff
received email from Defendant Marsha Lidgerding that application had been
approved. (Refer to Email Exhibit 16)

55.        Email dated 01/25/17, Plaintiff acknowledged that email had been
received from, Defendant Marsha Lidgerding, and inquired how much longer?
(Refer to Email Exhibit 9, page 25)

56.        Email dated 01/25/17, Defendant Shannon Ployhart that I would have
to work closely with Marsha Lidgerding. (Refer to Email Exhibit 10, page 27)

57.        Email dated 01/25/17, Defendant Marsha Lidgerding inquires about
what kind of subsidy will be paying for this. (Refer to Email Exhibit 18)

58.         Email dated 01/25/17. Plaintiff informed Defendant that GRH, the program Plaintiff was currently in would still be paying the subsidy portion of rent. Unknown to Plaintiff was the fact that Aeon, el at. was a Continuum of Care and a participant in the HTF/ELHIF Program. (Refer to Email Exhibit 11, page 28)

59.         Email dated 02/03/17, Plaintiff acknowledges that account transfer of benefits from Hennepin to Ramsey County along with attachment copy of pdf statement transfer document. (Refer to Email Exhibit 12, page 29)

60.         Email dated 02/03/17, The exact email was also submitted to Defendant, Colin Burkholder. (Refer to Email Exhibit 13, page 30)

61.         Email dated 02/03/17, Reply from Defendant, Colin Burkholder in which Plaintiff was informed HUD compliance regulations required that a direct verification from Ramsey County be acquired. (Refer to Email Exhibit 13, page 30)

62.         Email dated 02/03/17 at 1:09 pm, Plaintiff responded by relaying what Plaintiff was informed by Defendant Marsha Lidgerding and what steps had been done to close account in Hennepin County. (Refer to Email Exhibit 14, page 31)

63.         Email dated 02/03/17 at 1:22 pm, Plaintiff reiterated that the transfer had been complete. (Refer to Email Exhibit 14, page 31)

64.       Email dated 02/06/17 at 12:39 pm, Plaintiff informed Defendant, Colin

Burkholder that Ramsey County had confirmed that the transfer had been completed.

(Refer to Email Exhibit 15, page 32)


65       Email dated 02/06/17 at 12:56 pm, Defendant, Colin Burkholder

acknowledges that PA verification from Ramsey County shows transfer complete and

that he would be uploading it to thei9r system for their compliance team to review it.

(Refer to Email Exhibit 15, page 32)


66..       Email dated 02/13/17 at 1:07 pm, Plaintiff had heard nothing back from

Defendant, Colin Burkholder or Marsha Lidgerding and shot out an email requesting

update status on application approval. (Refer to Email Exhibit 16, page 33)


67.       Email dated 02/13/17 at 1:44 pm, Defendant, Colin Burkholder

requested further demands from Plaintiff. He indicated that they now needed 1. LTH

verification form from RS Eden, Emmanuel House, and 2. Have RS Eden case

manager type a letter explaining why the Crane Ordway Apartments would be a

better place for Plaintiff than RS Eden Emmanuel House? (Refer to Email Exhibit

17, page 34 and 35)

68.　　　　Email dated 02/13/17 at 4:50 pm, Plaintiff emailed Defendant Colin Burkholder pdf attachment Long Term Homelessness Verification Form 5-28-15, and RS Eden Leasing agreement. (Refer to Email Exhibit 17, page 34 and 35)

69.　　　　Email dated 02/13/17 at 4:52 pm, Plaintiff emailed Defendant Marsha Lidgerding pdf attachment Long Term Homelessness Verification Form 5-28-15, and RS Eden Leasing agreement. (Refer to Email Exhibit 19, page 37)

70.　　　　Email dated 02/13/17 at 9:51 pm, Plaintiff emailed Program Director, Louisa Montague at RS Eden-Emmanuel House requesting her assistance in the matter. (Refer to Email Exhibit 20, page 38)

71.　　　　Email dated 02/14/17 at 8:55 am, Plaintiff received acknowledgement of receipt from Director Louisa Montague. (Refer to Email Exhibit 21, page 39)

72.　　　　Email dated 02/14/17 at 9:44 am, Plaintiff acknowledged her receipt confirmation. (Refer to Email Exhibit 21, page 39)

73.　　　　Email dated 02/14/17 at 4:48 pm Plaintiff received required letter from Director Louisa Montague of RS Eden-Emmanuel House. (Refer to Email Exhibit 21, page 40)

74.        Email dated 02/14/17 at 5:43, Plaintiff forwarded official letter from Director Louisa Montague to Defendants Colin Burkholder, and Marsha Lidgerding. (Refer to Email Exhibit 21, page 40)

75.        Email dated 02/15/17 at 8:35 am, Plaintiff acknowledged receipt of important letter received from Director Louisa Montague and gratitude. (Refer to Email Exhibit 22, page 41)

76.        Email dated 02/15/17 at 10:33 am, Defendant Colin Burkholder acknowledged receipt of last requested document necessary for application approval. (Refer to Email Exhibit 22, page 41 and 42)

77         Email dated 02/20/17 Received email from Defendant Colin Burkholder that application had been approved and Plaintiff had been accepted into the LTH program and move in date was all that needed to be agreed upon. (Refer to Email Exhibit 23, page 44)

78..       Email dated 02/20/17, Plaintiff suggested move in date on 02/21/17. Defendant suggested 02/22/17. Plaintiff agreed and acknowledged receipt from Defendants made it final. (Refer to Email Exhibit 24, page 45, 46, and 47)

79.        03/21/17, at 1:05 pm, Plaintiff spoke to a new white tenant by the name

of Angela who resides in apartment #417, who indicated to plaintiff that she applied

30 days ago in November of 2016 and was approved on 12/23/16.


80.        Apparently, Mai'Nesha Cyrus, Aeon Assistant Site Manager and both

site managers Marsha Lidgerding, and Colin Burkholder worked diligently to process

her application, and others, while lying to Plaintiff and postponing eligibility and

occupancy for three to four months. These Defendants have specifically stated both

verbally and in emails, "at this time, I'm not sure if your application will be approved

because the background check has not come back yet." (Refer to paragraph 37, and

Email Exhibit-7)


81.        (RHR) Rental History Records, an entity who does the background

reports received the request on 11/17/2016 and completed the request eight days later

on 11/25/16. (Refer to Exhibit 51, page 279)


82.        Plaintiff alleges that the Defendants skipped other applicants over him

on their waiting list even though they applied after Plaintiff, based on Plaintiff's race

and sex in strict violation of: 24 CFR 960.206 (e)(1)(i)

          24 CFR 960.206 (Refer to Exhibit 4, page 50-52.

          24 CFR 982.207 (Refer to Exhibit 5, page 53-54)

83.         In addition to that, the unit they placed Plaintiff in was not the unit

Plaintiff was shown on 11/8/16. In fact, it was not even similar in design. Instead the

unit Plaintiff was placed in a small square unit where the floor was made out of

concrete marred with unremovable oil stains over two thirds of the floor and half the

size in square footage of the initial unit shown. It was a blatant action of Mis-

representation. Plaintiff remembered that there was a carpet store across the street,

and the owner was kind enough to allow me to take used carpet out of their dumpster,

to cover the floor of resident. (Refer to Exhibit 2-3, page 48- 49)


84.         For at least two months during the winter of 2017 which were March,

November, and December there was no heat, and Plaintiff had to run the oven to

provide heat in a unit the size of a large closet. The electric bill became overwhelming.

And during the summer, temperatures in Plaintiff's apartment exceeded 100 degrees

because the Defendants refused to repair the air conditioning unit, despite numerous

requests from Plaintiff. It should be mentioned that the windows would only allow

three inches of opening.


85.   Blank.


86.         04/09/17 at 1:09 am another incident witnessed by Plaintiff involved

Kelly Hawkinson from apartment 101, and Lance Matthews from apartment 612 and

a non-tenant drunken man and woman were in the main lobby, all totally intoxicated

drinking a 1.7 liter of Vodka in plain sight. Police was called because apparently Lance had assaulted another drunken tenant by the name of Dave who lives in apartment 512. Lance was arrested and taken to Detox. Dave was taken to the hospital. The drunken man and woman was made to leave. It came to police attention that Lance had taken Kelly Hawkinson 's keys and hid them in his apartment. (Refer to Exhibit 45, page 130, and 134)

87.     Brandy Wynn Parrott will testify that she found Kelly Hawkinson passed out on Lance Matthews floor on a pile of garbage. She stated that he had her sleeping on his floor for a week drunk, while he was committing unauthorizing usage of her credit cards. She lost her job at Kowalski's Market as supervisor because of it.

88.     The intoxicated woman wanted to get into the apartment with Kelly Hawkinson, in which Plaintiff spoke up and said to police that Kelly Hawkinson is vulnerable and this woman could steal all her possessions including personal items. The police agreed and escorted the woman out of the building. Later after the police had cleared out the Lobby except for Plaintiff. The intoxicated woman and man returned, in which Plaintiff called the police again and they took the man and woman's liquor and poured it out and told them if they come back out here again, that they would be taken to jail.

89.         04/27/17 Tenant by the name of Julie called St. Paul Police because Lance Matthews a tenant of apartment 612 kept Tenant in apartment 101 drunk in which the defendant's sister also called police and made report for tenant Kelly Hawkinson. The Police indicated to Plaintiff and other tenants in the lobby that there were animal dog feces all over the apartment from where no one took the small dog out and the apartment had a horrible smell of both human and animal urine. No lease violation was ever placed in Mr. Mathew or Hawkinson's file and none of the white tenants filed a complaint for this or the loud screaming and arguing between these two every night while they were together. (Official Police Report will be subpoena.)

90.         04/28/17, Brandy Wynn Parrott was assaulted by Lance Matthews, past tenant of unit 612 on elevator. Office was advised by victim, and no reprimand or lease violation letter write up was initiated or done by Aeon, Crane Ordway et al., for the assault.

91.         In the month of June 2017 there was a tenant meeting which was scheduled for 8:00pm posted in the elevator and hall ways where tenants would meet with Aeon Management employees Scott Redd, Vice President of Resident, Aeon Crane Ordway, Connections, and supportive Services and other top management employees.

92.        When I made preparations by going to my apartment first to pick up paper work, Scott Redd was knocking on my door where he identified himself. I asked him was he going to attend the meeting scheduled at 8:00pm, and he indicated that the meeting had been moved up by Defendant A, tenant in apartment 405. Plaintiff asked him why no one had been notified, and he said that he got a call from Defendant A requesting that the meeting time be moved up. Plaintiff asked him why he was at apartment, and he indicated that he had been informed by tenants, specifically Defendant A, that Plaintiff was letting people in the building that didn't live in the building. This of course was an utter lie and pointed out that there are no facts to back up their preposterous claim, and that it was purely conjecture.

93.        Plaintiff relied, "Based on what proof? I like to see the video tapes from surveillance cameras. Of course, access to view the tapes were denied. None were provided. Plaintiff informed Defendant Redd, "The only people that have been let in by me were my guest and I asked him, "are you implying that I'm not allowed visitors or guests? He replied of course not. Plaintiff added, "If anything, you should check the tapes on persons fabricating these lies, because these are the people who have been the ones involved in disturbances and violence just about every night since I have moved in." He indicated that he would check into it, and keep tabs on the surveillance cameras. This of course was a lie, and completely the opposite of his true intentions.

94.      Plaintiff requested his business card. Plaintiff informed him that the people who are making these complaints are the actual ones that are disruptive and should be the one's watched. Plaintiff is uncleared of which tenants attended this meeting, but clearly it was to undermine and deprive Plaintiff of attending that meeting so false accusations and character assignation could be established by a small number of consorted white tenants, organizing to ruin Plaintiff's credibility.

95.      06/30/17 at or around 3:30 AM, buzzer was ranged. Plaintiff asked who it was, and it was a person who Plaintiff didn't want access to the building and considered the person disruptive. Plaintiff indicated to her through the intercom, "No. Please just go away, otherwise Plaintiff will call the police." Shortly after, surprisingly the unwelcomed person was banging and yelling at me outside my apartment door. Five minutes later Plaintiff recognized the female voice of a tenant by the name of Defendant A from apartment 405 screaming and cussing from the hallway or elevator. For some unknown reason Defendant, A, in an apparent drunken stupor rage, began yelling at the unwelcome guess to get out.

96.      Defendant A was just as loud and disruptive, trying to scream over the woman. Defendant A of unit 405 could be heard clearly by everyone on the second floor screaming Plaintiff's name while Plaintiff was still in his apartment

behind his closed apartment door including though two sets of closed glass doors that separate apartment from all the other units except for apartment 201.

97.     The fact that Defendant A in apartment 405 resides on the fourth floor toward the north end of the building opposite from where Plaintiff lives which is on the second floor, on the south end of building, my only conclusion is that tenant of 405 intentionally let the person in. Though circumstantial, but based this fact that shortly after this unwelcome person made-contact with my apartment door, Defendant A of apartment 405 appeared out of no-where. Then made a consorted effort to initiate a volatile confrontation, Plaintiff suspects her behavior was induced by alcohol. Plaintiff did not find it a coincidence that she just happened to be walking by at 3:51 AM in the morning. Instead of escalating the situation into a full-blown predicament that could have easily gotten out of hand, she should have called the police as she ended up doing. (Refer to Exhibit 9, page 62)

98.     Common sense and logic asks the question, "why would Plaintiff allow a person access into the building if Plaintiff had no intention of allowing them access into his apartment? The last thing Plaintiff wanted was an unwelcomed guest screaming and banging on door?" Any objective minded person could see that doesn't make sense.

99.      The Crane apartments have a video surveillance camera at the front
entrance of this building which records the time, and dates, of people leaving and
entering building. The video surveillance camera located at the front entrance would
have revealed which tenant allowed this unwelcomed disruptive visitor access. (Refer
to Exhibit 9, page 62)

## 1st Written Warning Lease Violation

100.      07/03/18, Plaintiff received a 1st Written Warning lease violation letter
pertaining to noise and disruption from Corinna Lowe, Temporary On-Site Manager,
Portfolio Director for the Crane Ordway Apartments. She replaced Shanon Ployhart,
CPM, COS, Aeon Crane Ordway, Portfolio Director. (
1 7, page 56)

101.      Instead of Ms. Lowes investigating the incident for existing facts, she
made her decision based on hearsay and unsubstantiated facts and fabricated
allegations from Defendant A, (Refer to Exhibit 7, page 57)

102.      Plaintiff submitted   response to Ms. Lowe's 1st Lease Violation Letter
on July 5, 2017. Plaintiff provided contact information on the header of the cover
page, but six days later Plaintiff had still not received any acknowledgement of
receipt. (Refer to Exhibit 8, pages 58-61)

103.        07/10/17, Plaintiff emailed response to Scott Redd, Vice President of
Resident Connections and Supportive Services explaining that Plaintiff had
requested a meeting with Ms. Lowe in regard to her response letter, and that Plaintiff
had not received any acknowledgment or response from Ms. Lowe regarding response
letter. (Refer to Exhibit 10, page 63)

103-a.      07/11/17, Scott Redd shortly later acknowledged receipt of email and
forwarded it to Ms. Lowe. Almost immediately, hours later, an email was received
from her, once Plaintiff went over her head. (Refer to Exhibit 11, 12, pages 64-65)

104.        Because of conflicting schedules, finally Plaintiff met with Ms. Lowe on
or around July 20, 2017 and requested to see proof from the surveillance camera and
be provided a copy of the video for that date and time which would have proved that
Defendant A, tenant in Apartment 405 was lying when she informed Ms. Lowe that
Plaintiff allowed this individual access to the building. (Refer to Exhibit 14, 15, pages
67-68)

104-a       Plaintiff reiterated and requested from Defendant to see the video
footage from the surveillance tapes, and a copy of the actual police report as she stated
in her letter that was presented from Defendant A, tenant in apartment 405.

Defendant Corrina Lowe indicated that the tapes are erased after two weeks. And no copy of report was available. (Refer to Exhibit 9, page 62)

105.        Plaintiff could only surmise that Ms. Lowe reviewed the video tape and saw that it incriminated either Defendant A, tenant of apartment 405 or someone else of significance and that Ms. Lowe was aware of the request made on July 3, 2017 long before the redaction and or erasing of the evidence and intentionally got rid of the evidence to cover it up as to who really allowed the visitor to enter.

106.        If what she says is true that all tapes are erased after two weeks then she intentionally refused to respond to Plaintiff's emails or original response letter placed in the office drop box in which she had at least 7-8 days to review, and she didn't. Not to mention that on the 11th of July, she could have pulled the evidence, and exonerated Plaintiff of the fabricated allegation. Ms. Lowe still had another 7 days after the email submitted to Scott Redd to review the tape and pull it then. Being the Director, she could have ordered the site managers to hold off erasing of that evidence. (Refer to Exhibit 13,14,15, page 66-68

)

107        With utter malice and contempt for Plaintiff, she refused, and therefore through her procrastinating she discriminated against Plaintiff by denying tenant rights provided by Federal and state Housing and constitutional rights. Evidence that

could have exonerated Plaintiff was destroyed, intentionally placing the blame solely on Plaintiff.

108.     None of these requests were honored by Corinna Lowe, Temporary Site Manager, and Portfolio Director for the Crane Ordway Apartments. Note: Jamal Abdirahman, current Site Manger was also present at the time of the meeting. He also chose not to even review the footage that would have exonerated Plaintiff of the lease violation. No one was interested in pursuing these avenues to find out the facts. Whoever the tenant was who resides in the building shown on that video that allowed access to an unknown person should have been charged with the lease violation and not Plaintiff.

109.     Tenants know that while exiting or entering building that they are not allowed to grant access to visitors who are not their guest. In addition, the notice is posted on the front entrance door. Plaintiff did not let this person onto the premises therefore Plaintiff should not be held liable for whomever (Tenant) violated those rules.

110.     07/21/17, Between 7:30 am and 8:00 am, a homeless woman by the name of Sarah which Plaintiff knew, and tenant of 405 also knew was ringing Plaintiff's buzzer outside the locked security entrance door. Plaintiff told her that Plaintiff was busy and to come back later for food or to eat. Defendant A in apartment 405 let the

unwanted person in. Hours later at about 10:15am, me and my guest and girlfriend Rebecca Miller were leaving my place of resident when we were confronted and harassed by Defendant A, tenant of apt 405 in the lobby. She was screaming at us and shouting obscenities including lies and false accusations.

111.        This was witnessed by William Christensen, Field Supervisor of (UPA) United Protective Agency. Direct phone number 612-999-8625, office number, 612-724-2222. UPA office headquarters, 2817 Anthony Ln S. Suite 200. His email address is wchrsitensen@upaagency.com. He had indicated to me that this is not his first encounter with Tenant of 405 harassing other tenants at the Crane Ordway Apartments. He also indicated that he would be writing up a report on this incident. Mr. Christensen will testify to the incident occurred on this date.

112.        Defendant A of apartment 405 lied to the security guard alleging that Plaintiff buzzed the person in because someone told her that they heard me through the intercom say, "'I'll be right down". Plaintiff denied it and asked Defendant A, "who told her that", and whoever told her, let her in. Then Defendant A attacked my guess and girlfriend Rebecca Miller, verbally yelling that she shouldn't be here because she doesn't live here, and that she's been living here. This too was a lie, because Rebecca Miller lives in Maple Grove, MN.

113        This incident too was brought to the attention of Defendants Corinna

Lowe and Jamal Abdirahman, Crane Ordway Apartment Management's attention,

in which nothing was done to make this person cease the harassment, and no

investigation made. Defendant A, Tenant of 405 threatened to call Scott Redd, Vice

President of Resident Aeon Crane Ordway, Connections, and supportive Services

from her cell phone which was preprogrammed in her cell phone.


114.       Defendants Corinna Lowe and Jamal Abdirahman, response was

writing a groundless unsubstantiated 2nd Lease Violation Warning but Ms., Lowe was

not used or submitted to Plaintiff but was placed in file. I guess their intent was to

use it as back up. In Defendants Corinna Lowe initial signed letter, she states that

this is Plaintiff's 2nd Written Warning Lease Violation. In Corinna Lowe letter, she

lied stating that multiple sources have informed her that I have a guest living with

me. It's obvious that Defendant Corinna Lowe is working with Defendant A, because

she said pretty much the identical statement made by Defendant A. In other words,

in her opinion white tenants including Defendant A are allowed to have visitors and

a relationship, but Plaintiff is not allowed that freedom under their eyes. Plaintiff

and his guest mine their own business and have never bothered anyone at the Crane

Ordway Apartments.


115.       The letter was not forwarded to Plaintiff, the whole incident and follow

up was straight up retaliation and harassment with a consorted collaborated

conspiracy. Because of the blistering report on Defendant A pertaining to incident

incurred on 07/21/17, UPA's contract with Aeon, Crane Ordway apartments et al.,

was cancelled. Defendants' new angle was to use Defendant B who resides upstairs

in apartment 302, directly above Plaintiff's apartment unit 202. ~~(Refer to Exhibit 18,~~

~~page 71)~~ *Refer to Supplemental Exhibit 2, page 2)*

116.        Plaintiff demanded to see a copy of the video of how or who let the

woman called Sarah in through a secured building. Again, the defendants refused

Plaintiff's request. Now there has been two instances involving Defendant A, and

again Aeon, Crane Ordway Et al., top management covered up her involvement in

the incident and destroyed the evidence. By doing so, gave Defendant A and Et al..,

the green light to push forward with continued harassment and retaliation. By their

non-action to inform tenants to cease and assist, defendants Aeon et al.,

substantiated that they were not just complicit, but that they would double down on

the harassment, retaliation, and outright discrimination. *(Refer to Exhibit 6)*

**2nd Written Warning Lease Violation**

117.  ✗     In the second week of August 2018, Plaintiff received a second lease

violation dated July 31, 2017, pertaining to excessive noise from the current Aeon On

Site Manager, Jamal Abdirahman in which he states that on August 5, 2017 and

August 6, 2017, a complaint by tenants (unknown) was made concerning loud music.

In Defendant's eagerness to write up the fabricated lies, the idiot took the template letter from the first lies written by Corinna Lowe and simply changed the content of lies and description. The date of the lease violation letter conflicts with dates of incidents. Plaintiff is not sure of the precise date when the letter was written because it's dated July 31, 2017, a month before these fabricated allegations also occurred which this defendant states was in August of 2017. ~~(Refer to Exhibit 16, 17, pages 69, 70)~~ *(Refer to Exhibit 6-a)*

118.      In his letter, he states that Plaintiff turned the music down only after when a security officer from "United Protective Agency knocked on door and turned it back up after they left. This statement is a total fabricated lie. Plaintiff never changed the volume of the music.

119.      The security guard called the St. Paul Police department, alleging Plaintiff's music was loud and disruptive. When police knocked on door, Plaintiff was informed by St. Paul Police that they stood outside my door for ten minutes, before they knocked on door. When they knocked, Plaintiff immediately opened the door and they informed Plaintiff of why they were there. Plaintiff responded by saying, "are you serious?" Plaintiff stated, "officers you know my music isn't loud." Plaintiff closed the door behind him while he stood with the officers outside his residence and only a faint sound of music could barely be heard coming through the door, and they agreed.

They finished by informing Plaintiff that they weren't even going to write a report because in their own words, "it was bogus." (Refer to Exhibit 17, page 70)

120.     When Plaintiff again met with Corinna Lowe, and Jamal Abdirahman, Plaintiff informed them of what the police stated regarding these allegations outlined in the 2nd Written Warning Lease Violation. After this meeting, these Defendants (among others, including this inner circle of white tenants, and Aeon Property Management turned up the harassment and retaliation from a notch to full throttle. Living at the Crane Ordway Apartments became, "Nightmare on Elm Street."

121.     Plaintiff reiterated to the site manager that his apartment is located behind two closed glassed doors separated from the other apartment units. The only other apartment in my section of the building is apartment 201 which has been a vacant apartment for over 30 days. An emergency two door stair case separates apartment 203. The lobby is below me. The only apartment capable of hearing any sound from my apartment is apartment 302 above me, which is also unlikely because of the high ceilings and thickness. (See Video Exhibit 1 and 2)

122.     July 2017, Plaintiff met a gainfully employed white tenant in the lobby where a discussion began regarding harassments of other white tenants from Defendant A, and she expressed distain for this group of tenants who apparently in her own words stated, "Defendant A and her friends have taken over the building

with managements' blessing." She states that Defendant A of apartment 405 has threatened tenants, bullied the elderly, students, and continues to get away with it. Tenants are too afraid to speak up because Aeon Crane Management sides with whatever Defendant A says, said the woman. She assured Plaintiff that he should have no problem finding viable witnesses to testify to the fact, and in addition to Aeon, Crane Ordway, et al., unethical standards.

123.        She stated that tenants are afraid to speak out because Defendant A of 405 has direct authorization to report anything she deems fit (even if its untrue) on any tenant at the Crane Ordway apartments to Aeon Defendant Scott Redd, Vice President of Resident, Aeon Crane Ordway, Connections, and supportive Services and Corinna Lowe, Aeon Crane Ordway, Portfolio Director who have treated and stated as a matter of fact that Defendant A, tenant of apartment 405, and Kelly Hawkinson, tenant of apartment 101 represent a direct liaison between the tenants there at the Crane Ordway apartments and top Aeon Management managers. This tenant who wishes to remain anonymous also indicated that there are at the minimum a dozen other tenants who share her sentiments and need to be interviewed, . She finished by stating that HUD needs to come in and clean this place up, because it's a mess. (Refer to Exhibit 43-a, page 127)

124.        She indicated that they were having this special meeting at this very moment and not at the time that the meeting had been previously posted throughout

the building. Her announcement was to notify tenants that UPA Security Agency
were fired and to be  replaced by a new security agency called EPG Security Group,
located at 2928 North 2nd Street, Minneapolis, Minnesota 55411. Phone: 612-205-
6653, www.EPGSecurityGroup.com.   A meeting occurred between Aeon Property
Management, represented by Corinna Lowe and, Jamal Abdirahman, and top EPG
management group employees, whose names are still unknown at this time, and a
small group of inner circles of white Tenants represented and headed up by
Defendant A of apartment 405 and Defendant Kelly Hawkinson, Tenant of 101.


124-a       These group of people intentionally planned a meeting where everyone
was notified but minorities, except for one co-conspirator, and their pawn in this
game, Defendant B, a vulnerable mentally disturbed minority, tenant of apartment
302 who Defendant A and Aeon, et al., have manipulated and used him to promote
their unethical practices. Apparently, Defendants Aeon, Crane Ordway et al., lease
apartment unit 202 to minorities only and then Defendant B listens in on their
preparations, begins his starking, and harassments, whereas he and other
defendants put their playbook in action by fabricating incidents, invading their rights
to privacy, and play their children's games with people's live. Destroying people's
lives, creating delusional incidents by listening through the air vent. Plaintiff alleges
that Defendant B's vent is a floor vent located on the wall next to the floor.

124-b     Whereas approximately between five to ten feet below is Plaintiff's vent which is located directly over kitchen cupboards in Plaintiff's apartment. The Air Vent is located closet toward the kitchen ceiling. This Character witness is one of their point men whose goal is to assist the Defendants have been very successful in coercing; and intimidating minorities into signing their Mutual Lease Termination Agreement before their annual program recertification is completed. Plaintiff eavesdrop and heard that I am the third black man to occupy that unit, and most likely to be forced out, from what neighbors have stated.

125.      In return for his loyalty, the Defendant's, Aeon, et al., pretty much let Defendant B do whatever the hell he pleases. Anywhere from starking tenants to hiding in the hallways and stairways-yelling, screaming and singing at the top of his voice throughout the neighborhood; throughout Crane Ordway apartment building; in his apartment; anytime in the middle of the morning, night, and afternoon. (Refer to Video Exhibit 10)

125-a     Aeon Property Management, Crane Ordway Apartments Et al.., retaliated, cancelled their contract, and had UPA security agency replaced by EPG security group because of the damning report witnessed and filed by William Christensen, Field Supervisor of (UPA) United Protective Agency, whereas he attempted to file a lease violation against Defendant A for the incident incurred on 07/21/17, between 7:30 am and 8:00 am, aforementioned in paragraph 110. Plaintiff

called UPA and left messages for Mr. Christensen on both his cell and direct office number, but no return phone calls were ever received. Plaintiff did make contact with a gentleman on 10/09/2017, at 10:29 am. He was a manager over Mr. Christensen, by the name of Jerry Holder who refused to give any specifics on the incident once I mentioned the purpose of my call involving Defendant A and the Aeon, Crane Ordway Apartments.

126.     He finished by stating that he was unable to provide any information or details concerning files or reports pertaining to the 07/21/17 incident because of a signed confidentiality agreement. A Court Order Subpoena is the only option that would compel UPA to disclose the content of Mr. Christensen's report and other possible damning evidence against the defendant (s).

127.     When Plaintiff entered the meeting, Plaintiff went and sat in the back and both Defendant A of apartment 405 and Kelly Hawkinson were both indiscriminately making eye contact and, nods, and head gestors to both management staff of Aeon and EPG managers toward Plaintiff. In other words, they were identifying Plaintiff to EPG top management. It was obvious that Plaintiff was the subject of their discussion.

128.        8/11/2017, A memo from Defendant, Corinna Lowe, Supervisor and Portfolio Director of the Crane Ordway Apartments was circulated to all the tenants of the Crane Ordway Apartments substantiating this. (Refer to Exhibit 8).

129.        8/11/2017, Plaintiff was across the street coming from an appointment when I observed a woman described as 5'7, 200 lbs., chubby blond-haired person with a white shirt, and black slacks on. When she was approached by Plaintiff, inquiry was made as to what her business was up on top of the stair case. There are only double doors used specifically for emergency exit in the event of a fire. Also, the only apartment next to the stair case is Plaintiff's apartment which is 202, and 203. I noticed that she was specifically interested in the direction of where Plaintiff's apartment was located. I also noticed the black jacket she wore did not bear the EPG insignia. When she noticed that I was at the bottom of the stairs observing her. Her answer to why she was at the top of the stairs was that she was security for the building. Apparently on her first day she felt it necessary to specifically zero in on my apartment. (Refer to Video Exhibit 3)

130.        08/12/2017, at or around 11 PM, Plaintiff and his guest and girlfriend Rebecca Miller departed apartment heading to the elevator, when Plaintiff noticed an EPG security guard hiding and posted down just around the corner of the hall way by the laundry room on the second floor at the end of the hallway, concealing herself. (Refer to Exhibit 20, page 77)

131.        This woman, described as 5'7, 200 lbs., blond-haired person with a white

shirt, and black slacks on, and is identified as the same woman who Plaintiff

encountered on 08/11/2017 up on the stair case of Crane Ordway apartment

emergency exit doors. When the elevator arrived she quickly ran down the hall to

catch it with us. When Plaintiff and guest arrived at the lobby she waited as we exited

the building and followed us outside. Plaintiff looked back at her as they crossed the

street. She stood in front of the building and began talking on her cell phone and

smoking a cigarette.

132.        Plaintiff and Rebecca Miller proceeded across the street to sit at the

benches located at the North east corner of Farmers Market just across from CHS

baseball stadium.

133.        While sitting at the benches, the blond EPG security guard walked from

the front entrance down to a black or dark blue 2015-2017 GMC truck which was

parked directly straight across the street from where Plaintiff and Rebecca Miller sat.

She unlocked the doors as another vehicle pulled up alongside hers. She unlocked the

car doors while standing on the sidewalk, and walked around to the passenger side,

unclear of what her intent was, she then walked toward the end of the truck from the

front to real, then went back to the driver side and sat in the truck for approximately

20 mins when Plaintiff notice that she was either filming them or taking pictures.

Plaintiff apprised Rebecca Miller that the EPG security guard had followed them and that she appeared to be now videotaping and/or taking pictures of them. Plaintiff instructed Rebecca Miller to film him as he approached the truck filming the EPG security officer. (Unfortunately, evidence which was transferred to a flash drive dated 08/13/17 is missing) Available:

(Refer to <u>Video</u> 4, 5, 6) and Exhibit 21- 22, pages 79-80)

134.     The reason for this request of Rebecca Miller was because Plaintiff had noticed and remembered that this EPG security officer was carrying a fire arm when they were on the elevator. Plaintiff walked over to the truck while filming her take pictures of them. When Plaintiff walked pass the front then slowly pass the driver side door of the vehicle, she noticed that Plaintiff was recording her and jumped out of the vehicle and got physical and made contact with Plaintiff's, aggressively trying to knock Plaintiff's cell phone out of his hand. (Unfortunately, when Plaintiff came home from an appointment; the video file was somehow deleted off laptop.

135.     She placed her hand on her revolver and before she attempted anything else again, Plaintiff pointed out and informed her that they both were being filmed by Rebecca Miller across the street at the bench in farmers market. Only then did she stop her aggression toward me. Plaintiff returned to the bench, and the security women walked from where her vehicle was parked, over to where we were sitting, and called the police. She lied on the 911 call to the St. Paul, <u>Police Dispatch</u>. The

dispatch recording will confirm that the EPG officer fabricated falsehood and lies of incidents that never occurred. She indicated to the St. Paul Police Officer dispatch that we were drunk and disorderly. When the police arrived, she tried to explain some bogus incident.

136.     When it was Plaintiff's turn, we explained that this security guard who was supposed to be on patrol protecting and providing security for the Crane Apartments has been following and stalking him and guest from place of residence, from the elevator, and then followed us down the street, whereas the security officer began taking pictures of us while sitting in her vehicle when she was supposed to be working security at the Crane apartments. The police officer simply shrugged his shoulders and offered advice, "she could have shot you, and even though she would have been in the wrong, she could've gotten away with it. The Officer then drove off. A record of her 911 call from the St. Paul Police Department Dispatch will be obtained for verification to substantiate Plaintiff's claim.

137.     Note that in Corinna Lowe Memo, dated 08/11/17, she specifically states that, "We will have patrols that stop in multiple times Sunday through Thursday nights. There is a "real time" tracking device so Management can see what they're (EPG) doing and when they're here." In other words, Aeon Property Management LLC, et al., knew and were complicit in the illegal surveillance and invasion of Plaintiff's privacy incurred on 08/12/2017.

138.     08/13/17, After her blunder and discovery of EPG intent and involvement, the blond EPG security guard (name unknown) was replaced by a Black EPG security officer. Plaintiff encounter this individual the next evening while exiting the building. He was sitting in the lobby, as though he was expecting me. Defendant A wasted no time becoming acquainted, and cozy with the EPG security guard.

139.     August 18, 2017, Plaintiff and his guess and girlfriend Rebecca Miller was returning from sitting at the benches at Farmers Market when Defendant A, tenant from 405 was standing with a new EPG security guard outside the front entrance of the building smoking cigarettes together. While approaching the building, Plaintiff video recorded them standing just west of entrance door, posted out front of building. As me and guess approached, Defendant A tenant of apartment 405 was advising him of my identity. The video shows her speaking to him, then EPG guard looked in Plaintiff's direction and then back to her as she stared directly at Plaintiff for a short moment while talking to the EPG guard.. (Refer to Video Exhibit 7, and Exhibit 23, page 80)

140.     On or around August 20, 2017, Aeon Property Management, Crane Ordway Apartments, et al.., hired a business with a company logo named "IFS" on its vehicle. (Refer to Exhibit 24, page 81)

140-a          IFS installed an ULTRA HD surveillance camera by the elevator

pointing directly at the door of Plaintiff's apartment instead of down the hallway

where four to five white tenants in apartments reside. Their intent and purpose, to

single Plaintiff out, invade privacy, create an atmosphere of intimidation, and create

a stressful environment full of dreadful anxiety whereas Plaintiff hated to leave his

apartment because Aeon Property Management wanted Plaintiff to know that the

first thing seen when he left his apartment, was the eye of that camera pointed

directly at him. Even checking the mail box, washing clothes, or taking out the

garbage became a ritual of harassment where they would same to be taking turns,

watching Plaintiff as if a common criminal who trespassed onto their property. This

Picture Exhibit represents two cameras discarded and found in the garbage bin due

to defected labeled on box They are identical to the one placed at my door. (Refer to

Exhibit 25, page 82- 83)

140-b          This Picture Exhibit represents two cameras discarded and found in the

garbage bin due to defected labeled on box They are identical to the one placed at my

door. (Refer to Exhibit 26, page 84)

141.          Returning was no better because these same individuals were out front

waiting with demeaning glares and snicker expressions of smiles on their faces. The

worst was returning home for Plaintiff.  All behavior by Defendants were designed to

further their schemes of non-stop aggravation, and harassment. Plaintiff interpret this new action by Aeon Crane Ordway Property Management Et al. installment of this HD surveillance camera was done only on the second floor specifically directed at Plaintiff's apartment designed to pressure tenant into breaking lease and move out.)

142.　　　It should be noted that this special ULTRA HD camera was placed only on Plaintiff's floor which is on the 2nd floor. (Refer to Exhibit 27, page 85-88)

143.　　　These same types of shameful despicable tactics were used on a previous minority, (headed up by Defendant A and other defendants named in this lawsuit), whereas the harassment, and intimidation successfully succeeded in forcing him into signing an Mutual Lease Termination Agreement to by threating him with a detainer and/or eviction in which placing a permanent stain on his rental record therefore prohibiting and making it impossible for him to find future occupancy rental should he fight it in Small Claims Court and lose.

144.　　　The third-floor surveillance camera is Exhibit 27, page 85 on the third floor. The fourth-floor surveillance camera is Exhibit 27, page 86 and 87
The. Fifth-floor camera surveillance camera is Exhibit 27, page.

## 3rd Written Warning Lease Violation

145.        07/31/17, Plaintiff received a 3rd Written Warning Lease Violation letter dated July 31, 2017 (same date as the 2nd lease violation letter) from Jamal Abdirahman. In this letter he states that on August 26, and 27, 2017, my music was disturbing others which was documented by an EPG security staff. (Refer to Exhibit 28, page 89)

146.        Again, Defendant's eagerness to write up new unsubstantiated fabricated lies showed how incompetent an idiot he is, and again Defendant took the same template from the last lies that were written and simply changed the description. The date of the lease violation letter conflicted with dates of incidents. Plaintiff is not sure of the precise date when the letter was written because it was dated July 31, 2017, a month before these new fabricated allegations occurred which the defendant states was in August of 2017.

147.        August 30, 2017 at around 1:00 pm, a scheduled, meeting was made concerning this current alleged lease violation with Plaintiff, and Defendant Jamal Abdirahman, Aeon Crane apartment site property manager. At approximately 12:45pm, Plaintiff encountered Defendant C, new resident of apartment 201 in the lobby. Plaintiff interviewed Defendant C, tenant from apartment 201 concerning this

recent incident, before she became complicit in this collaboration with Defendant A and management to oust Plaintiff from the building.

148.　　　I asked her did someone knock on her door August 27, 2017, and she informed me in the lobby of the Crane apartment that it was a black man dressed in EPG security uniform that knocked on her door, described as 145 lbs., 5'7', Black African American with a dark complexion, in his late 20's or early 30's thin built. It was later discovered that it's the same individual in paragraph 139, Video Exhibit 7, and Exhibit 23.

149.　　　When she didn't answer her door after he knocked, she said she observed him through the peep hole leave and go directly back to the elevator. Under the direction of Defendant, A, Tenant in apartment 405 and Aeon Crane Ordway apartment management, EPG security guard filed a false incident report, despite the fact that he knocked on the wrong door and had no inclination where the music was coming from.

150.　　　His failure to distinguish which apartment exhibits how loud my music was not. Phone records will show that before and after, that Defendant B, tenant from 302 called tenant of 405 who called this Black EPG security officer who in turn contacted Jamal Abdirahman to fabricate this lease violation.

151.      Plaintiff do not believe anyone made a complaint. Plaintiff has personally witness this security guard leave from the fourth floor on numerous occasions, and away from his patrolling duties spending hours in the company of Defendant in apartment 405. This is the same EPG security guard discovered having sexual intercourse with Defendant A, tenant in apartment 405 in the piano room located in the lobby by two tenants who stories were collaborated.

152.      12/14/17, Because of this EPG Security Guard, incompetence, and Defendant A, and the EPG security guard's lust to satisfy their sexual appetite, it caused EPG their lucrative contract. Defendants Aeon and Crane Ordway, et al. then maneuvered to cover up the embarrassment and protect Defendant A. Notwithstanding no Lease Violation was ever issued for any of the indiscretions. Aeon et al., has proven with a record of accomplishment that they are experts at covering up dirt for Defendant A, and cleaning up their dirty laundry. In Defendant's Memo dated 12/14/17, she specifically points out, "due to lack of response." Plaintiff wonders why? (Refer to Exhibit 40, page 121)

153.      Further, in Jamal Abdirahman's letter he states that on August 30, 2017 we both sat down to discuss the noise complaints. Plaintiff informed him that the only speakers available are located on TV in which a cell phone is hooked up to it, and that they were incapable of producing enough noise to disturb other tenants. Instead of seeing for himself, he never, even to this day tried to see for himself that these

complaints were unfounded and positively fabricated by EPG and defendants named in this complaint.

154.        Plaintiff tried to explain to Defendant that when you get noise complaints from tenants about other tenants, its up to management to prove if the tenant making the complaint is just doing it out vindictiveness, or if it's a valid complaint. Plaintiff explained that the way to do that is have a sound tech come out and do sound measurements of noise levels to determine whether there is a valid reason for the complaint. In small claim court, the judge usually requires prove of the decimal levels before making a determination. But, Defendants (Property owners or management) could have requested it by calling The City of St. Paul. at 651-266-8989 about noise which may be louder than city limits ordinances. An inspector may contact the operator, come out with a Sound Decimal Meter, measure the loudness and duration of the sound, and determine whether there is a violation.

155.        Plaintiff believes that it is the responsibility of the property owner to produce those findings. The findings are then incorporate into the lease agreement as an addendum. It is obvious, by his actions that defendant (s) have contempt for the fact of law. Defendant, Jamal Abdirahman prefers to be ignorant of the law because he never appeared interested in the statues involved by never researching to see even what the ordinance was, or the specifics contained. The City of St. Paul, Noise Regulation City Ordinance is, 293.01 (6) (7,) pursuant to Minnesota Statutes, Section 471.62. The term for this type of testing is called a quantified isolation, in which the A-weighted sound pressure level expressed in dBA, obtained by the use of a <u>Sound Level Meter</u> having characteristics as specified in the ANSI standard s1.4-1983 Ord. No. 16915,5-200-82; Ord. No. 1744,8 and 17586.

156.       Plaintiff also suggested that he should find out if there is an ordinance that places a limit on decibel levels, and if there is, then tenants can know that they cannot exceed that level. As usual, Defendant wasn't interested in the truth. Unfortunately, some individuals don't function on the facts. With their head in the sand, they only want to believe that what they think is the truth and not realistic actuality of facts. What defendant(s) fail to understand is that Tenants are allowed to live their lives, and sometimes that includes making noise. (Refer to Exhibit 19, page 72-76)


157.       Finally, in his letter Jamal Abdirahman states that he received notification and complaint on August 31, 2017 during the day that there was another disturbance with loud arguing and excessive noise coming from my apartment. Plaintiff have no idea where he's getting his information from, but this too is a lie, in which Plaintiff vehemently deny. My question is at what time during the day did this occur? Was it all day, five hours, 2 minutes, or what? Who or which tenant exactly is spreading these lies. There is absolutely nothing to collaborate this false claim. No EPG or Police report. No shred of proof.  Defendants accusations are groundless and purely manufacture.

## 4th Written Warning-LEASE TERMINATION

158.         09/28/17, Plaintiff received a Lease Termination letter from Defendant, Jamal Abdirahman. In his letter, he states that on September 27, 2017 Plaintiff was being issued a lease violation for Excessive noise and disturbances. (Refer to Exhibit 29, page 90)

159.         Plaintiff admits that there was an argument, but it was not out of control. There was no cussing, or violence involved. There was simply a misunderstanding between two adults in a relationship. There was no screaming or shouting or fighting. Defendant C in apartment 201, by now collaborating, and complicit with other defendants in their discriminatory practices, knocked on Plaintiff's door and asked if the noise could be kept down. Plaintiff tried but it escalated again for a brief moment. Other than Defendant C from apartment 201, no EPG security guard ever knocked on Plaintiff's door pertaining to excessive noise nor were police notified to make an official report. Defendant C became fully involved and complicit in the discriminatory retaliation, harassment plot with other Defendants named in this complaint to force Plaintiff out. There is absolutely no consistency or logic in their Aeon, Crane, et al., protocols, policies, or procedures when it comes to lease violations issued by these individuals. One would think that their policies depend on what side of the bed Defendants get out on.

160.       This was solely based on here say from Defendant C tenant of apartment 201. Although the disagreement was brief, Defendant's took the initiative and opportunities to move closer with groundless allegations toward expulsion of Plaintiff's occupancy. The hypocrisy of the Defendants is beyond imagination. While Defendant C works overtime with other collaborators becoming immune to least violations she is allowed to scream at the top of her voice, spur out filthy profaning, and making life for her ex-spouse a living hell. Plaintiff has personally heard and witnessed Defendant C trash Ex's car throwing all his belongings into the street directly in front of the entrance way to Crane Ordway Apartments while tenants and pass byers looked on as she called him degrading names.

161.       10/1/17, at 5:50 pm individual Kelly Hawkinson of apt 101 kept ringing buzzer for Plaintiff to let her in. Again, sounding drunk and stupor. It was disrupting and disturbing.

162.       10/01/17, that night, Kelly Hawkinson, Defendant of apartment 101 was totally drunk in the main lobby and caused such an outrageous disruption the police had to be called. Her drunken stupor behavior infringed on the rights of every tenant who resides there, but she is allowed a free pass to be obnoxious; disorderly; and out of control as she wanders around the building smelling like urine, half dressed, falling into walls, cracking her head and annoying other tenants. Harassing Plaintiff with despicable unwanted provocative sexual advances, while enjoying complete impunity.

163.     Despite the fact that Plaintiff did everything in his power to help the Defendant Kelly Hawkinson overcome her alcoholic addiction by going to a few AA meetings with her on Summit and Victoria, in St. Paul, MN, and encouraging her not to surrender to the demons, in return to show her gratitude, and appreciation she worked with Defendant A and others named in this complaint to lie and participate in the defamation of Plaintiff's reputation and credibility.

164.     Her ulterior motive for demeaning, degrading and behavioral participation of retaliatory bigotry against Plaintiff, is due, Plaintiff believes, because of Plaintiff's on-going refusal to accept her relentless numerous and continuous sexual advances and sexual harassment.  The rejection caused her to despise Plaintiff. All of this was at one time or another caught on Crane Ordway Apartment's video surveillance camera, but they, the Defendants Aeon et al., refused to address this issue despite the fact that they knew Plaintiff was being stalked by this defendant, and did nothing.

     (Refer to Video Exhibit 9, Specifically time frames, between 10:40 mins to 12:27 minutes into video.

165.     Instead what they did was commit more coverups by destroying evidence that could have been used to stop this aggression perpetrated by a white woman on a black man. In the mind of Plaintiff, these actions by Defendant Kelly Hawkinson were

interpreted as an attempt by all defendants in this complaint to set Plaintiff up for some type of criminal sexual charge.

166.   This was bought to Defendant Jamal Abdirahman attention in which he was given the exact date and time and all he had to do was look at surveillance tapes. Either because if ignorance, or incompetence, there is no excuse for the lack of attention or investigation into these serious allegations. Ignorance or incompetence is not a defense in the eyes of the law, and justice for all. Because of Defendant(s) Jamal Abdirahman discriminatory M-O, Plaintiff took it upon himself to produce the evidence and proof that Plaintiff is unjustifiably being treated as a second-rate American citizen and intentionally being targeted by Defendants, and being subjected to unethical types of retaliatory shameful practices including starking and sexual harassment.

167.      10/04/17 at around 8:pm to 9:00 pm, Defendant A of apartment 405 again verbally attacked Brandwynn Christina Parrott, a friend of Plaintiff, and harassed her for that reason, and because Defendant A wanted her man, who resided in apartment 305. Plaintiff plans to subpoena witness to testify to that fact that Defendant A continued numerous times to throw sex and any other means necessary to interfere with their relationship. After relentless verbal harassment Ms. Parrott got a Restraining Order on Defendant A. After the restraining order expired, Defendant A began her harassment again where she left off.

167-a        10/04/18, Defendant Jamal Abdirahman sends Plaintiff more junk mail. In this letter he gives fair notice Plaintiff's household is to vacate unit by noon on 01/31/2018, because Defendants will not be renewing lease. His ignorance of the law is overwhelming.

167-b        Under what, or whose authority does he assume to have the power to change the locks on a tenant's door, and throw that household out on the street? Even non-high school graduates know that only an Honorable Judge in a court of law can evict a tenant. (Refer to Exhibit 30, page 91)

168.        10/12/17, Plaintiff enlisted an arbitrator to assist in mediation between Plaintiff and Defendants. Top brass for this region in St. Paul in relationship to Aeon, et al., properties were contacted by the non-profit organization and executive representative, Metric Giles I, Executive Director, Community Stabilization Project, 501 N. Dale St., Ste 203, Saint Paul, MN 55103, Tel: 651-236-8692, metriccsp@gmail.com. A formal response was submitted to Aeon, et al., and Mr. Giles and his associate, from Plaintiff regarding the Fourth Written Lease Termination letters from Defendant Jamal Abdirahman, Aeon Crane Ordway, Site Manager. Plaintiff was not impressed with the representation of the non-profit, or its executive, Mr. Giles. (Refer to Exhibit 31, pages 92-111)

169.     The relationship between the non-profit and the Defendants were too cozy. Because of Mr. Giles inexperience or incompetence in these matters, defendants were allowed to slip by with removing one violation, in which they quickly made up for by issuing another violation.

170.     10/14/17, Defendant B, Tenant of apartment 302 was yelling, singing, and screaming in the building through the hallways. The police were called and arrived at or before 3:30 pm to 4:00 pm in which they took Defendant B into the piano conference room, adjacent to the main lobby. What was discussed between the officers and Defendant C is unknown. What is clear is that he was physically taken to his apartment, and ordered to remain there for the evening, or face possible incarceration. (Refer to Exhibit 45-a, page 152, complaint #17242754)

171.     No reprimands, lease violations, or complaints were ever filed or documented on Defendant B in apartment 302. The evidence was destroyed, and the incident covered up.

172.     10/17/17, at 7:00 to 7:45 pm on lobby video, police arrived at Defendant Kelly Hawkinson in apartment 101. Her sister was contacted by a Tenant by the name of Julie, because Defendant was out of control and drunk and causing disturbances. No lease violation was filed.

173.        10/25/17 at 3:00 to 3:30 pm, Defendant A from apartment 405 was waiting for me and my guest Rebecca Miller captured on video at the front door.

174.        10/29/17 evening, Defendant A of apartment 405 harasses Dave from apartment 512 in the lobby because Dave has hired Plaintiff's friend Brandwynn Christina Parrott, as his care giver/PCA.

175.        Blank.

176.        11/29/17 at or around 12 noon, Plaintiff left to catch a flight to visit children out of state. As Plaintiff exited elevator and proceeded through the lobby, the Defendant site manager Jamal Abdirahman was sitting at his desk as if he knew the exact date and time and where Plaintiff was going. (Refer to Exhibit 33, page 113)

177.        Plaintiff was planning to be returning on 01/05/2018. Defendant site manager Jamal Abdirahman knew that Plaintiff was leaving town because Plaintiff paid both December 2017, and January 2018 rent in advance. (Refer to Exhibit 32, page 112)

178.        12/05/17, six days after Plaintiff departed on flight, Defendant, site manager Jamal Abdirahman Et al., in a premeditated shameful, and deceitful despicable manner, Aeon, et al., attempted a sneaky maneuver to undermine

Plaintiff.by serving Notice to vacate apartment. The person presented herself as an attorney and had someone hand deliver the Notice in an envelope just inside my apartment door. In her letter she identified herself as Laurel J. Pugh, a Share Holder for Bassford Remele, A Professional Association. The accusations in her letter, were ludicrous and outrageous! (Refer to Exhibit 34, page 114 and (Exhibit 35, page 115)

179.      The letter attached to the proposed Lease Termination document was dated 12/05/17. Representative stated in her letter that proceedings of eviction were to commence 12/11/17.  Plaintiff's gut feeling pushed him to return on 12/13/17, and in which their plot was foiled. (Refer to Exhibit 36, page 116) and Exhibit 37, page 117)

180.      11/19/17 at 11:15AM, Plaintiff went to go get coffee and smelled marijuana in the hall ways on the way to the elevator. Plaintiff informed management at 11:45AM. Instead of addressing the issue, Defendant, site manager Jamal Abdirahman seen it as an opportunity to pinned it on Plaintiff. What the Defendant failed to realize is that Plaintiff's choice of drugs is not Marijuana. Had the Defendant took time to read Plaintiff's file, he would have discovered that. There is nothing in my background check conducted by (RHR) Rental History Reports. (Refer to Exhibit 51, page 279-286)

180-a        in addition, Plaintiff completed a 7-month treatment program in 2013 and have stayed cleaned since. I personally tracked down who was smoking the Marijuana in the building and to Plaintiff's surprise, it turned out that it has been Defendant A in apartment 405, and Defendant B in apartment 302 on alternate days. A Court Order providing access to a police K-9 officer to enter these defendant's apartment can verify that there would be a strong resin smell of the drug still existing in their apartment, and no resin of the drug in the apartment where Plaintiff resided. (Refer to Exhibit 38, page 118-119)

180-b        Every situation I told the Crane Ordway site manager Jamal Abdirahman about, he turned the truth into lies against me. Plaintiff told him about this tenant who encourages his dog to urinate and drop feces on the elevator in front of the building entrance door, including the lobby This incompetent fool accuses one of my guest of doing it. Defendants also allege that one of my guest urinated in the stair case, which is outrageous. Just about every tenant in the building knows that there is a white tenant by the name of Rick, 5'7, 175 lbs. who owns a black Labrador Retriever, in which he intentionally has his dog urinate in the elevator, lobby, stair case, and poops right outside the entrance door. The person identified in the picture exhibit is the same person I informed Defendant about. (Refer to Exhibit 39, page 120)

181.        I told this idiot, the Defendant site manager Jamal Abdirahman, that someone keeps smoking weed in the building. This lying sob commits defamation when he knowingly tells a third party (Laurel J. Pugh) who puts it in writing that I and my guest have been smoking marijuana with not a shred of proof.

182.        Under Minnesota Civil Rules of Procedure Rule <u>55.01 (a)(b) Judgment</u>: When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend within the time allowed therefor by these rules or by statute, and that fact is made to appear by affidavit, judgment by default shall be entered against that party.

182.a       Dishonesty of the Defendants have no bounds to which they will go. Their treacherous deceitful intent was to wait until Plaintiff left town, file a notice as required as a Continuums of Care provider, Title 24 CFR 578, file for a detainer, then quickly get a court date from a sympathetic small claims administrative clerk.

183.        Defendants would have won the eviction hearing by default and Plaintiff would have lost judgement due to failure to appear or non-appearance.

184.        Had Plaintiff not returned on the date of 12/13/17, instead of on 01/05/18, he would have returned to his apartment where access to the building would have been denied. Locks would have been changed on the apartment door, and I could

or would be sited for trespassing by any tenant, specifically Defendants named in this complaint.

185.      Plaintiff would not be surprised to discover emails outlining their subversion when discovery is filed with the courts and documented phone records and emails are compelled by subpoena to produce.

186.      12/14/17, because the EPG security Guard spent most of his time at Defendant A's place of resident apartment 405, instead of working his job, and the fact that Defendant A, and the security guard were caught by tenants having sexual intercourse in the piano room located on the first floor, adjacent to main lobby, Aeon, et al., sent a Memo out to all Crane Residents giving notice that because of the Professionalism of EPG and its organization, stipulated in Defendant Corrina Lowes Memo dated 08/11/17, Defendants Aeon, et al., fired, and cancelled EPG's contract and their services due to incompetence, inconsistencies, and embarrassment. In truth, it was another cover up to protect Defendant A. (Refer to Exhibit 40, page 121)

187.      Other additional, and possible new cover ups are listed in the 06/29/2018 St. Paul Police Report print out Plaintiff has obtained. The report tells the Plaintiff that they are again attempting to cover up and hide the truth of what is actually going on over there. It tells a story of various instances of injustice, in which certain

tenants are being targeted, and others protected. The report shows that one tenant in unit 512, who at one time was part of their inner circle, has now been targeted.

188.     Plaintiff has been advised that Tenant in unit 305 has been added to that list and targeted by Defendant A, and her group of predators simply due to one of Plaintiff's witness's boy-friend has rejected Defendant A's sexual advances.   The only other tenant that Plaintiff is aware of who stands out is unit 512. Notice that descriptions of his indiscretions are the only ones listed. Aeon, et al., are trying to hide their nefarious tricks and deceptive practices perpetrated by Defendants. (Refer to Exhibit 45-a, pages, 149-152)

189     Defendant Aeon, et al., has been aware that Plaintiff has been going to the St. Paul Police Department records section to obtain police reports due to Plaintiff's response letters to their fabricated Lease Violation letters. Now they have stooped to a new low whereas they are now using official servants of the people to hide their discrimination, and retaliation towards other tenants. They have employed an off-duty St. Paul, Police Officer as security to patrol the premises. It should be noted as off duty Police Officers, they are not working in their official capacity, therefore must follow the directives of its employer, Aeon, et al., which has been revealed in this complaint as an entity managed by some very dishonest untrustworthy managerial individuals who stop at nothing to lie, cheat, and destroy

anyone who gets in their way, or who attempts to disclose the truth about their nefarious business dealings. (Refer to Exhibit 45, page 129-148)

190.        06/29/18, Plaintiff went to the Saint Paul Police Department located at 360 Grove St, St. Paul, MN to obtain an updated report on the activity over at the Crane Ordway Apartments located at 281 E. 5th Street, St. Paul, MN 55101. The quantity of calls has not decreased even though 99.9% of the HTC/ELTHIF occupants at the Crane Ordway Apartments are white, (as it has been since Plaintiff lived there) But what has differed is a significant change in the description of incidents occurred, once the off-duty Police Officer took over contract from EPG. Instead of listing the apartment with a brief description of reason for call, most of the entries on the report state: "OFF DUTY EMPLOYMENT." (Refer to Exhibit 45-a, pages 149-152)

191.        The Defendants are attempting to hide their unconstitutional discriminatory behavior by using 24 CFR 5.105, in which law enforcement cannot give out information to the public if the people involved are fleeing domestic violence; sex trafficking, etc. But this Court has authority to review the actual police reports that explain why the police were there and who was involved. A motion to have those records disclosed must be submitted. The Federal Courts have the authority to order the release of records on the specifics of the information contained if the violence being committed are being done by the white tenants themselves to others, instead of as the Defendants would have you believe are those they invite into their homes.

192.      The Defendants are trying to conceal and justify their discriminatory practices under the cloak of 24 CFR § 5.2005 – VAWA, protections. (Refer to Exhibit 45-b, 153-157)

193.      I suspect that the reason for this is that these are the same white tenants that should have had their leases terminated long ago but individuals Aeon Property Management LLC and its partner, Crane Ordway Partnership, employees, support their discrimination, harassment, and retaliation methods in which they have covered up, concealed and destroyed evidence, and caused a lot of suffering, and undue hardship, and grief to those who have tried to stand up to this multi-million dollar Limited Liability Company. There intention is to use federal statues nefariously to protect individuals that are executing their discriminatory practices.

194.      Under 2 CFR § 200.336 (a) (b) Access to records. (Refer to Exhibit 45-c, page 158)

        (a) Records of non-Federal entities. The Federal awarding agency, Inspectors General, the Comptroller General of the United States, and the pass-through entity, or any of their authorized representatives, must have the right of access to any documents, papers, or other records of the non-Federal entity which are pertinent to the Federal award, in order to make audits, examinations, excerpts, and

transcripts. The right also includes timely and reasonable access to the non-Federal entity's personnel for the purpose of interview and discussion related to such documents.

(b)     Including Court Orders or subpoena pursuant.

195     12/31/17, 11:21 AM Kelly Hawkinson of apartment 101 ranged my apartment buzzer through my intercom. She sounded intoxicated. Ask me to buzz her in. she stated that she had forgotten her keys. (Again)

196.     01/01/18 at 10:15 am, my guest Kimberly Hill went to the Super America, and upon returning, she encountered Defendant B of apt 302 blocking the stair case. She informed me that she asked what he was staring at and he replied, "looking at your ass!"

197.     01/02/18 at 3:45 pm, Plaintiff went to liquor store located one block from plaintiff's resident. Upon returning Defendant A in apt 405 was waiting outside with other white tenants, and Defendant B, a tenant of apt 302 was standing just inside the security staring, blocking the door way, as Plaintiff made his way inside the entrance.

198.     **Tenant Defendant B** lives in apartment 302 up above Plaintiff's apartment who goes by the name of Richard, identified as Defendant B. (Refer to

Exhibit 41, page 122)   In his apartments, in all hours of the day or night, Defendant B is screaming, yelling obscenities, and singing, purposely to annoy the tenants and the entire community. Plaintiff can provide up to 15 or 20 witnesses who would be more than willing to testify to the fact. I was able to catch a brief recording of the kind of noise we as tenants and a community has and have to put up with.

(Refer to <u>Video</u> Exhibit 10)

199.       The City of Saint Paul has installed hundreds of surveillances cameras throughout Saint Paul. Saint Paul Police Department Manual 480.00 Closed Circuit TV (CCTV) Unit Monitors the Closed-Circuit Television system to prevent crime in the City of Saint Paul. The CCTV employees monitor live video feeds; track live video for certain calls in progress; document ongoing suspicious activity; provide long term video monitoring of specific locations for sporadic criminal activity; retrieve archived video from incidents already reported; and be responsible for the handling of data from in-car cameras.

200.       A Court Ordered Subpoena for review of video records from March 2017 through February 12th, 2018 will prove and expose to the court that Defendant B, tenant of apartment 302, did invade Plaintiff's privacy rights and phone records will show that he has been the eyes, and ears for all the defendants listed in this complaint, the downtown St. Paul CCTV cameras are located on every corner in upper and lower downtown St. Paul.   CCTV records video cameras will show that

Defendant(s) on numerous occasions have been waiting, following, and stalking Plaintiff and his guess throughout the neighborhood for almost 6 months that Plaintiff is aware of.

201.        01/28/18, A guest of mine, Kimberly Hill is harassed exiting the building by Defendants B and C, tenants in both apartments 201 and 302.

202..        02/02/18, Kimberly Hill is harassed by Defendant B of apartment 302 as she was returning.

203.        02/03/18, at approximately 11:30 to 12:00 pm, Kimberly Hill was harassed exiting the building by Defendant B, last name unknown, in apartment 302.

204.        White Tenant who live in apartment 512, has had police out to his apartment from 10/04/17, 25 times since 2012. Police have answered calls pertaining to drunkenness; sexual molestation; civil problem investigations; auto theft and disturbances. Aeon Crane Ordway Property Management consider these incidents as tolerable instances consisting of disorderly, excessive noise, and disruptive instances that don't warrant lease violations. Nothing by property management has ever been done, because as the facts show, these tenants still reside at the Crane Ordway apartments. (Refer to Exhibit 45, page 131)

205.        Lance Matthew Tenant who lived at the Crane in apartment 612, lived Scott-free for years even after committing harassment phone calls; civil problem investigations; theft of credit cards; assaults; Domestic incidents; fights; death-suicide in progress; drug use, and drunkenness. One of the last things he did which no action was taken by Aeon Crane Ordway personal was perpetrate a burglary that was witnessed by other Crane tenants; restaurant employees including their patrons from across the street at "The Saint Dinette" located at 261 E. 5th Street, St. Paul, MN. 651-800-1415. Including myself, the aforementioned witnesses, Mr. Matthew illegally break and did enter into Kelly Hawkinson's residence from the west end apartment window of apartment to 101's which faces Wall Street. When the police arrived, they allowed him to escape out the front door inside the building. He was identified by numerous witnesses and was forwarded to the leasing office which nothing was done. (Refer to Exhibit 45, page 132)

206.        May 10, 2017, Mr. Matthew, Tenant of apartment 612 blacked out from drunkenness and started a fire in his apartment. He attacked the Fire fighters when they busted in the door to put out the fire, whereas, the police took him into custody. Only then was he evicted in May 2017.

207.        Kelly Hawkinson a white Tenant in apartment 101 has had the police out to her place 22 times, and 9 times in the year of 2017 alone. The police report provided by Plaintiff from the St. Paul Police records department do not list

apartment numbers involving incidents with tenants outside their apartments. Each of those types of incidents have to be manually pulled from their records because actual police reports were written. (Refer to Exhibit 45, page 129)

208.        Defendant A, Tenant who lives in apartment 405 has her own skeletons in her closet whereas she has been involved with; death-suicide; three instances of disturbance-disorderly; fights; and domestic. But Property management here at the Crane has thrown out the red carpet for her. No infractions exist in her file.

209.        Except for tenant in apartment 612 who was finally removed on May 10, 2017, these same white individuals have been involved with violence, sexual molestation, theft, burglary and et al.

210.        Plaintiff find it ironic that property management here at the Crane Apartments is working overtime on hearsay allegations to terminate my lease, while they turn a blind-eye to the real people that are disturbing and being disruptive, and clearly interfering with the enjoyment of other tenants to be free of police officers and their criminal activities in the building involving nefarious behavior.

211.        The question is, how many Written Warnings of Lease Violation for noise and disruptions, and disorderliness have been placed in their files and the

numerous other white tenants listed in this inception to date police report at the Crane Apartments located at 281 East 5th Street, St. Paul, MN?

212.     It is disturbing that within three months, perpetrated lies, through a collaborated joint effort has been fabricated against Plaintiff, as Jamal Abdirahman states in his Termination letter to me, "Plaintiff have committed intolerable acts of lease violations", while at the same time he turns a blind eye and provides white tenants with complete immunity who are the ones who have "actually" committed intolerable behavioral acts of lease violations for years to inception to date.   The hypocrisy of these same individuals including management have conspired against Plaintiff and other minority groups. Aeon Crane Ordway have never complained about white tenants who have repeatedly through the course of years been disruptive, and worst yet, even dangerous.

213.     Jamal Abdirahman and Corinna Lowe have continuously stated, "that per tenant's lease agreement, quiet hours are between 10PM and 8AM." After review of my complete lease agreement and addendums, there is absolutely no clause in this agreement or addendums that specifically states, "that quiet hours are between 10PM and 8AM." (Refer to Exhibit 49, 50, 51, 52 pages 229-291)

214.     Defendants' Aeon Property Management et al., have sponsored harassment; retaliation, discrimination, and defamation in violation of Federal and

State laws, including character assassination, by spreading lies to other white tenants who at once used to say hello, and who now ignore Plaintiff.

215.     Plaintiff is being systemically setup. Their intent, to retaliate against Plaintiff because he spoke up about their unethical behavior. This group of five to seven white tenants state that they represent the tenants which consist of over sixty tenants here at the Crane, but in fact they are the only ones that attend their own tenant meetings. They represent only their personal interests.  These individuals practically feel as if they own the Crane Apartments. Committing deprivations of tenants' state, federal, and constitutional rights.

216.     Plaintiff lived at the Crane Ordway since February 22, 2017 and Plaintiff have played music the same as Plaintiff currently played it when these alleged violations were issued., (Note: Plaintiff only played music on the weekends). For four months, Plaintiff had no complaints, until the incident on June 30, 2017, which involved Defendant A, Tenant apartment 405. And, only after the meeting on or around July 20, 2017 with Jamal Abdirahman and Corinna Lowe, did these fabricated accusations of lease violations begin.

217.     The incident on June 30, 2017, and the meeting occurred on July on or around July 20, 2017 appears to be the catalyst or driving force. Since then, Plaintiff has been harassed by a group of tenants headed up by a woman whose full name is

unknown at this time but is identified as Defendant A. Rose, a tenant in apartment 405 and a woman in apt 101 by the name of Kelly Hawkinson along with a group of other white tenants and one minority who presents himself as a starker and sexual predator who screams; sings in front of the building; in his apartment; up and down through the streets in the middle of the nights and early mornings before six o'clock. Numerous, perhaps dozens of witnesses throughout the neighborhood, and just about all the tenants at the Crane Ordway apartments know this. *(Refer to Video Exhibit 12 & 13) (Refer to Exhibit 45-a, page 152*

218.     The perpetrators involved in this conspiracy along with Aeon, Crane Ordway, et al., are...

     1.    Rose, identified in complaint as Defendant A, unit 405.

     2.    Richard, Identified in complaint as Defendant B, unit 302.

     3.    EPG security guard.

     4.    (Name unk) Identified in complaint as Defendant C, unit 201.

     5.    Kelly Hawkinson, unit 101.

219.     It should be noted that Defendant A has been in constant contact with all defendants (tenants) who filed and instigated a lease violation against Plaintiff. I have provided proof through photographs substantiating this claim. In Exhibit 41, page 122, Defendant B is waiting for Plaintiff and guest to exit building then unknowing that Plaintiff was behind him filming, he exits the building attempting to follow Plaintiff. When he realizes that Plaintiff has not exited the building, he returns

in the video and heads toward the elevator. Plaintiff exits the building and <u>Defendant</u> <u>A</u> of unit 405 is outside expecting Plaintiff and looks Plaintiff straight in the face. (Refer to Video Exhibit 11)

220.        In Exhibit 42, page 123, and 124, <u>EPG security guard</u> is in the company of <u>Defendant A</u>, of unit 405, a week before they fabricate another lease violation.

221.        In Exhibit 43, page 125, <u>Defendant A</u>, of unit 405 is in the company of <u>Defendant C</u>, tenant in unit 201 days before she initiates a lease violation against Plaintiff.

222.        In Exhibit 43-a, page 126, and 127, the primary defendants or point-men in this discrimination, sexual harassment, harassment, and retaliation along with Aeon, et al., are <u>Defendant A</u>, of unit 405, and <u>Kelly Hawkinson</u> of unit 101.

222-a        Defendant A is under investigation by the St. Paul Police Department for making numerous bogus 911 phone calls on her tenants that live in the Crane Ordway Apartments, with the Site Manager's blessing. The St. Paul Police department has stated that all 911 calls dispatchers receive are to clear it through Sgt. Sipes, because the police have found that Defendant A has been lying to the Police Officers and calling over 10 times in one week on one person. (Refer to Supplemental Exhibit 1-2)

223.        In Exhibit 44, page 128, illustrates the proximity of defendant's place of residence to Plaintiffs unit. Note that Defendant A is on a different floor (two floors up) on the other side of building. *Refer to Audio Exhibit 5)*

224.        Plaintiff knows that subpoenaed phone records, emails, video, audio tapes, testimony, and all other material evidence will give those who have lost hope, a sense of justice when these people are exposed for who they really are, and will substantiate that Defendant (s) named in this Federal discrimination law suit have conspired, collaborated, schemed, planned with malice, pure contempt, and premeditated intent to cause severe injury by forcing Plaintiff back onto the streets to suffer the pains of homeliness while still receiving grants, tax incentives and other perks that come with pretending to care, when in reality Aeon, Property Management Crane Ordway Apartments allow one class of people to sit in front, while the other class of people are forced to sit in the back of the bus. *Refer to Audio Exhibit 5)*

225.        THE MOST shocking, appalling, awful, horrendous, outrageous, unspeakable, shameful, unforgivable, intolerable, egregious abuse of Defendant's authority and power over the fate of the homeless was disclosed when Plaintiff discovered that the Defendant (s) committed a COVER UP of Plaintiff's MHFA (Minnesota Housing Finance Agency) Homelessness," Coordinated Entry Assessment" certification records.

226. ، The Continuum of Care (CoC) program is authorized by the McKinney-Vento Homeless Assistance Act (McKinney-Vento), as amended by the Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009, which is Division B of Public Law 111-22, approved May 20, 2009 (HEARTH Act).

227. For 15 months, one year, three months, and counting, Plaintiff was, has, and is being denied equal treatment under the law.

228. Under 24 CFR § 576.2, the Defendant, Aeon Property Management LLC AND Crane Ordway Partnership dBA Crane Ordway Apartments are Continuum of Care Providers, as participants in the Continuum of Care Program, under the ESG grant. who receive the ESG awards. The Defendant's would have had to evaluated, process, and completed the assessment and to begin official rental of the unit to Plaintiff on February 22, 2017. (Refer to Exhibit 49-52, pages 229-290)

229. 05/14/18, Plaintiff had appointment with Sheila Lemon, a Housing Case Manager at Salvation Army Harbor Light Center Emergency Shelter, located at 1010 Currie Avenue, Minneapolis, MN 55403. Her contact information is 612-767-3100. Plaintiff explained to her that an assessment and certification had already been processed by the Defendants, Aeon Property Management, and Crane Ordway Apartments, and that Plaintiff participated in the Housing Trust Fund (HTF) Program and Ending Long-Term Homelessness Initiative Fund program. (ELTHIF)

230.        Ms. Lemon logged into MN HMIS System and indicated that there is no

assessment, that is no information that I, Plaintiff even lived at the Crane Ordway

Apartments and that I, Warren F. Nelson did not exist on the CES/HMIS system. She

inquired what county was the assessment processed in, and Plaintiff indicated

Ramsey County. Ms. Lemon indicated that Plaintiff need to check with the

Defendants. Plaintiff called and have left numerous messages on Defendants voice

mail since February 17, 2018, and no one has ever returned Plaintiff's phone calls.


231.        05/21/18, Called Steve Lawrence, Director of Operations at Radius,

formally known as South Metro Human Health Care, referenced in one of Marsha

lidgerding's emails. (Refer to Exhibit 55) His phone number is 651-256-1207. Mr.

Lawrence indicated that there is no record on their CES, or HMIS system. (Refer to

Audio Exhibit 3)


232.        05/21/18, Received call from Travis Simmons, Director of "Access"

equivalent to CES. From Radius, formally known as South Metro Health Care.

Contact number, 651-340-7939. Mr. Simmons indicated that there is no record of

Plaintiff onto CES or HMIS system. He also indicated that Aeon, Crane Ordway

would have been the only ones that would have access to enter the required

information because they are participants and recipients of those various program

funding. (Refer to Audio Exhibit 4)

233.         05/23/18, called (MHFA) Minnesota Housing Finance Agency at 651-296-8293 and spoke to a woman by the name of Lian, who indicated that Ramsey County Human Services would be the Recipient assigned to that region of Minnesota. (Refer to Audio Exhibit 5)

234.         05/24/18, called Ramsey County Social Services. spoke to Julie Johnson at 651-266-9990 and she indicated that she would check into it and find out who I should speak to and find out who the Lead person CES/HMIS Administrator was. Plaintiff received a response from Ms. Johnson, in which she gave me three numbers at the Ramsey County Human Services Department. Those numbers were: 651-647-3137; 651-215-2262; 651-266-4479. Plaintiff called all three and left messages.

235.         05/24/18, received a call from the Ramsey County Human Services CES/HMIS Lead administrator whose name was Lian (last name unknown). She confirmed that Plaintiff did not exist on neither the CES or HMIS system database. She confirmed that the defendants, Aeon Property Management, a Limited Liability Company, Crane Ordway, are listed as a Continuum of Care in the HTF/ELHIF funding program, is required to enter Plaintiff's complete assessment and financial data into the CES system, which in turn Ramsey County as the Recipient could upload and update the Minnesota state wide HMIS system whereas so other CoC's in other regions of Minnesota (like Hennepin County, Dakota County, Anoka, etc.) could review participants needs and assessment. This data is necessary for HUD to

evaluate and make determinations for new housing if Plaintiff decided to seek a different region to find housing. (Refer to Audio Exhibit 6)

236.        Defendant, AEON Management, LLC, AEON Property Management, Defendant, Crane Ordway Apartments, Crane Ordway Limited Partnership knew exactly what they were doing when they intentionally kept Plaintiff out of the CES process and HMIS database. Two disturbing facts exist:

1.     Defendants knew about the State of Minnesota's "HOMELESS CRISIS RESPONSE SYSTEM." Defendants knew that if there was no record of a completed assessment, referral, certification, recertification, and housing, Plaintiff would have no proof and at this point in time, there is no proof. (But, I suspect Defendants will try to cover their tracks due to all the inquiries made) Because of negligence, Plaintiff is forced to start from the beginning by doing a new coordinated entry assessment and will have to enter **Temporary Emergency Shelter,** in which currently this is Plaintiff's situation. I am currently at the Salvation Army Harbor Lights located in Hennepin County. The Defendants' goal and purpose... to cause as much damage, suffering and undue hardship to Plaintiff as possible in retaliation for Plaintiff speaking up against their discriminatory practices. Defendants succeeded in forcing homelessness on Plaintiff, despite their hollow oath to join in with other partners and organizations to end it. Plaintiff must admit that the Defendants

are very proficient at destroying people's lives. Supplemental Exhibit 3 shows the court that the program was working and giving Plaintiff a sense of self-esteem, and empowerment to excel and to start living a life of self-worth. Plaintiff started to believe that there was still hope and a chance to become part of a collective gathering of intellects and apart of the American dream. Supplemental Exhibit 4 shows how the defendants with premeditated intent and malice stole that from me and put me back in a little box and in a bunk bed where they felt Plaintiff belonged (Refer to Supplemental Exhibit 3, and 4 of 23)

2.      Defendants knew that had they entered Plaintiff's assessment, collected data, records, and other relevant information onto the CES/HMIS, which in turn recipient (Ramsey County) who rely on this information from the CoCs' (the Defendants) would have transfer the data onto the MN HMIS statewide database, Plaintiff would by-pass the Temporary Emergency Shelter and be eligible for **Targeted Prevention and Diversion** which enables <u>clients to retain housing or gain new housing by-passing shelter.</u> The Defendants knew that had they performed their duties as required by law, Plaintiff's subsidies would still be active and in place. If not for the retaliatory and discriminatory practices, Plaintiff would still be active in the HTF/ELHIF program with full benefits and subsidies intact to enter the **Community Based Permanent Housing**. (Refer to flow chart Exhibit?)

237.        Note: $630.00 for rent charged by Defendant, AEON Management, LLC,

AEON Property Management, Defendant, Crane Ordway Apartments, Crane

Ordway Limited Partnership. Plaintiff resided at the Crane Ordway Apartments,

beginning February 22, 2017, (Refer to Exhibit 49, page 229-286) and was forced to

end his tenancy by Defendants on February 17, 2018. The Lease Termination

Agreement validates the end date. (Refer to Exhibit 52, page 287-291) The program

paid approximately 12 months of Rent at $630 multiplied by 12 months equal $7,560,

of which $7,464 was paid through the HTF/ELHIF program fund.

        (Refer to Exhibit 48, pages 187-215)


237-a       Plaintiff was made to spend money out of his own pocket for the damage

deposit and obtain application fee from other sources, despite the fact that under the

GTF/ELHIF Rental assistance program guide, Funds are provided under this

program to cover these fees. (Refer to Exhibit 48, section 3.02, page 197)


238.        Obviously there should have been hard copies submitted to the

HTF/ELTHIF program, MHFA, Ramsey County Human Services and other relevant

agencies. But is there a record of the transaction amounts paid in 2017 on the

Property Online Reporting Tool (PORT)?


239.        The State of Minnesota's fiscal year begins July 1, 2017 and ends on

June 30, 2018. Under 24 CFR 576.500, The Minnesota Housing Financing Agency

requires Continuums of Care to file their financials every quarter. In this case, the Defendants would have filed their quarterly financial reports in the 3rd quarter which is January 1, 2018 through March 30, 2018.

240.        Because of Defendants unethical practices and patterns, Plaintiff states that after 1 year and 3 months, (15 months) that Defendants have intentionally covered up participation of Plaintiff in the HTF/ELTHIF Long Term Homelessness program. The question remains, has the $7,560 which represents part of the grant that Defendants received from MHFA-Minnesota Housing Finance Agency to house Plaintiff been covered up also? However, the most important question one should ask oneself is, how many other helpless homeless minorities have been victims of these nefarious despicable acts perpetrated by these Defendants?

240-a        07/23/18, Melea Blanchard, Program Supervisor, Homeless Elders Program, from Catholic Charities of St. Paul, and Minneapolis, Tel: 612-204-9262. Plaintiff met at a scheduled appointment with Ms. Blanchard whereas she evaluated and performed a Coordinated Entry Assessment and posted it to the MN-HMIS data base system. (Refer to Supplemental Exhibit 18-23)

241.        Because of these recent discovered facts, a full-scale investigation by every Government Agency both State and Federal should be launched to clarify if there also exist criminal intent by Defendants, AEON Management, LLC, AEON

Property Management, Crane Ordway Apartments, Crane Ordway Limited Partnership. Or at the least penalties and/or sanctions.

242.      Listed below are Agency, State, Federal Statues, and laws that govern the programs that are appropriated and funded by U.S. Congress to end Homelessness in America.

## MINNESOTA HOUSING FINANCE AGENCY

### **MHFA**

Minnesota Coordinated Entry System, (CES) Policies and Procedures Framework as of November 2016.

Coordinated Entry System ("CES")

243.      A Coordinated Entry System ("CES") represents a new approach to coordination and management of a (CoC) <u>Continuum of Care</u>'s housing crisis response system. CES enables CoC providers and homeless assistance staff to make consistent decisions from available information to efficiently connect people in crisis to interventions that will rapidly end their homelessness. The CES approach also aligns with State of Minnesota goals to transform crisis response systems to improve outcomes for people experiencing a housing crisis.

244.   .       Continuum of Care Program, and it codified into law the CoC planning

process. The CoC Program interim rule (24 CFR 578) released by HUD in 2012

requires that CoCs establish and operate a "centralized or coordinated assessment

system," hereafter referred to as a coordinated entry system. The rule defines

coordinated entry as:

1.      a centralized or coordinated process designed to coordinate program

participant intake assessment and provision of referrals. [Such a] system

covers the [CoC's] geographic area, is easily accessed by individuals and

families seeking housing or services, is well advertised, and includes a

comprehensive and standardized assessment tool. (24 CFR part 578.3)

2.      Both the CoC Program interim rule and the <u>Emergency Solutions</u>

<u>Grants</u> (ESG) program interim rule **(76 FR part 75953)** released in 2011

require that projects operated by recipients and subrecipients of CoC or ESG

grant funds must participate in the established coordinated entry process.

## Participation Requirements

245.      HUD and VA have recently established guidance that instructs all CoC

projects to participate in their CoC's Coordinated Entry system. A CoC project

includes any homeless prevention or homeless assistance program regardless of

funding source. However, projects that receive HUD funding (CoC Program, ESG,

HOPWA) or VA funding (SSVF, GPD, VASH) must further comply with the specific participation requirements as established by the corresponding CoC jurisdiction.

246.   The State of Minnesota has established minimum statewide requirements for CES participation for all state funded homeless projects, including those funded by Emergency Services Program (ESP), Family Homeless Prevention and Assistance Program (FHPAP), and Transitional Housing Program. At a minimum CES participation includes the following for all CoCs in Minnesota:

- CoC projects must publish written standards for client eligibility and enrollment determination.
- CoC projects must communicate project vacancies (bed and/or unit) to the Coordinated.
- Assessment administrative entity established by CoC leadership.
- Persons experiencing a housing crisis must access CoC services and housing using CoC defined access points.
- CoC projects must enroll only those clients referred according to the CoC's designated referral strategy.
- CoC projects must participate in the CoC's Coordinated Assessment planning and management activities as established by CoC leadership.

Coordinated Entry System Design Principles

1. Adopt statewide standards but allow flexibility for local customization beyond baseline standard.

2. Promote client-centered practices – Every homeless person should be treated with dignity, offered at least minimal assistance and participate in their own housing plan. Provide ongoing opportunities for client participation in the development, oversight, and evaluation of coordinated assessment. Clients should be offered choice whenever possible.

.

3. Prioritize most vulnerable as the primary factor among many considerations – Limited resources should be direct first to persons and families who are most vulnerable*. Less vulnerable persons and families will be assisted as resources allow. *Vulnerability will be defined locally.

4. Eliminate barriers to housing access – Identify system practices and individual project eligibility criteria which may contribute to excluding clients from services and work to eliminate those barriers.

5. Transparency – Make thoughtful decisions and communicate directives openly and clearly.

6. Exercise continuous quality improvement efforts – Continually strive for effectiveness and efficiency and agree to make changes when those objectives are not achieved.

7. Promote collaborative and inclusive planning and decision-making practices.

8. Diversity – Respect cultural, regional, programmatic, linguistic, and philosophical differences.

9. CES data driven – use data to analyze local housing needs and create a diversity of housing options.

10. Native American sovereignty —Work individually with Tribal Nations to acknowledge and honor sovereignty.

(Refer to Exhibit 46, pages 159-170)

---

## STATE OF MINNESOTA

Homeless Management Information System (HMIS)

### HMIS and Data Collection

247.     All CoC's shall comply with the data sharing policies developed by the HMIS Advisory Task Force and Data Sharing planning group. Some participating CES providers will need to opt out of data sharing practices to comply with the explicitly expressed requests of clients who wish not to share their information or in

cases where providers are prohibited from participating in HMIS or sharing client information (e.g. victim service providers serving households fleeing domestic violence). In these instances, coordinated entry protocols will need to accommodate management of prioritization lists using masked or encoded identifiers of applicable households.

248.     Each CoC will use the HMIS designated by the CoC to manage data related to CES operations. At a minimum data collected from CES participants and managed in HMIS must include all data necessary to generate an accurate and complete CES Management Report (see Appendix A for a draft version of this report)

       .

249.     CES Management Report data will be derived from the HUD-defined Universal Data Elements (UDEs), select Project-Specific Data Elements (PSDEs), and additional data elements from the MN HMIS Question Bank.

250.     CoC are encouraged to access the official MN HMIS Question Bank to review approved questions and response categories for consideration in local data collection requirements. Any additional data collection requirements beyond the baseline set established by IDG in official policy must be drawn from the official MN HMIS Question Bank.

(Refer to Exhibit 47, page 180-209)

# U.S. Housing Urban Development

HUD Procedures and Policies

January 23, 202017

Notice CPD-17-01

251.        24 CFR 578.7 (a) (5) (6) (b) (1) (2) (3) (4) (5) - **Responsibilities of the Continuum of Care.**

(a) Operate the Continuum of Care. The Continuum of Care must:

(5) In consultation with the collaborative applicant and the HMIS Lead, develop, follow, and update annually a governance charter, which will include all procedures and policies needed to comply with subpart B of this part and with HMIS requirements as prescribed by HUD; and a code of conduct and recusal process for the board, its chair(s), and any person acting on behalf of the board;

(6) Consult with recipients and sub recipients to establish performance targets appropriate for population and program type, monitor recipient and

subrecipient performance, evaluate outcomes, and take action against poor performers;

(b) Designating and operating an HMIS. The Continuum of Care must:

(1) Designate a single Homeless Management Information System (HMIS) for the geographic area;

(2) Designate an eligible applicant to manage the Continuum's HMIS, which will be known as the HMIS Lead;

(3) Review, revise, and approve a privacy plan, security plan, and data quality plan for the HMIS.

(4) Ensure consistent participation of recipients and sub recipients in the HMIS; and

(5) Ensure the HMIS is administered in compliance with requirements prescribed by HUD.

252.     CoC maintains written policies and procedures that prohibit the coordinated entry process from screening people out of the coordinated entry process due to perceived barriers to housing or services, including, but not limited to, too little

or no income, active or a history of substance abuse, domestic violence history, resistance to receiving services, the type or extent of a disability-related services or supports that are needed, history of evictions or poor credit, <u>lease violations</u> or history of not being a leaseholder, or criminal record.

HUD Coordinated Entry Notice: Section II.B.4

(Refer to Exhibit 47, pages 171-186)

---

# U.S. Federal Statues: The Code of Federal Regulations

253.         24 CFR § 576.2

**Continuum of Care (CoC)** means the group composed of representatives of relevant organizations, which generally includes nonprofit homeless providers; victim service providers; faith-based organizations; governments; businesses; advocates; public housing agencies; school districts; social service providers; mental health agencies; hospitals; universities; affordable housing developers; law enforcement; organizations that serve homeless and formerly homeless veterans, and homeless and formerly homeless persons that are organized to plan for and provide, as necessary, a system of outreach, engagement, and assessment; emergency shelter; rapid re-housing; transitional housing; permanent housing; and prevention strategies to address the various needs of homeless persons and persons at risk of homelessness for a specific geographic area.

254.        24 CFR § 576.2

(Recipient) means any State, territory, metropolitan city, or urban county, or in the case of reallocation, any unit of general purpose local government that is approved by HUD to assume financial responsibility and enters into a grant agreement with HUD to administer assistance under this part.

255.        24 CFR § 576.2

Homeless Management Information System (HMIS) means the information system designated by the Continuum of Care to comply with the HUD's data collection, management, and reporting standards and used to collect client-level data and data on the provision of housing and services to homeless individuals and families and persons at-risk of homelessness. (Refer to Supplemental-Exhibit 5-17)

256        24 CFR § 576.400 (a) (b) (c) (d) (f)

Area-wide systems coordination requirements.

(a) Consultation with Continuums of Care. The recipient must consult with each Continuum of Care that serves the recipient's jurisdiction in determining how to allocate ESG funds each program year; developing the performance standards for, and evaluating the outcomes of, projects and activities assisted by ESG funds; and developing funding, policies, and procedures for the administration and operation of the HMIS.

(b) Coordination with other targeted homeless services. The recipient and its subrecipients must coordinate and integrate, to the maximum extent practicable, ESG-funded activities with other programs targeted to homeless people in the area covered by the Continuum of Care or area over which the services are coordinated to provide a strategic, community-wide system to prevent and end homelessness for that area.

(c) System and program coordination with mainstream resources. The recipient and its subrecipients must coordinate and integrate, to the maximum extent practicable, ESG-funded activities with mainstream housing, health, social services, employment, education, and youth programs for which families and individuals at risk of homelessness and homeless individuals and families may be eligible.

(d) Centralized or coordinated assessment. Once the Continuum of Care has developed a centralized assessment system or a coordinated assessment system in accordance with requirements to be established by HUD, each ESG-funded program or project within the Continuum of Care's area must use that assessment system. The recipient and subrecipient must work with the Continuum of Care to ensure the screening, assessment and referral of program participants are consistent with the written standards required by paragraph (e) of this section. A victim service provider may choose not to use the Continuum of Care's centralized or coordinated assessment system.

(f) Participation in HMIS. The recipient must ensure that data on all persons served and all activities assisted under ESG are entered into the applicable community-wide HMIS in the area in which those persons and activities are located, or a comparable database, in accordance with HUD's standards on participation, data collection, and reporting under a local HMIS. If the subrecipient is a victim service provider or a legal services provider, it may use a comparable database that collects client-level data over time (i.e., longitudinal data) and generates unduplicated aggregate reports based on the data. Information entered into a comparable database must not be entered directly into or provided to an HMIS. ~~(Refer to Exhibit 48-a, pages 216-219)~~ Refer to Supplement Exhibit 7-19 pages 7-19

[ 76 FR 75974, Dec. 5, 2011, as amended at 81 FR 80808, Nov. 16, 2016]

257.      24 CFR § 578.3 Definitions:

**Continuum of Care and Continuum** means the group organized to carry out the responsibilities required under this part and that is composed of representatives of organizations, including nonprofit homeless providers, victim service providers, faith-based organizations, governments, businesses, advocates, public housing agencies, school districts, social service providers, mental health agencies, hospitals, universities, affordable housing developers, law enforcement, organizations that serve homeless and formerly homeless veterans, and homeless and formerly homeless persons to the extent these groups are represented within the geographic area and are available to participate.

258.     **Homeless Management Information System (HMIS)** means the information system designated by the Continuum of Care to comply with the HMIS requirements prescribed by HUD.

259. **HMIS Lead** means the entity designated by the Continuum of Care in accordance with this part to operate the Continuum's HMIS on its behalf.

260.     **Permanent housing** means community-based housing without a designated length of stay and includes both permanent supportive housing and rapid rehousing.

261.     **To be permanent housing**, the program participant must be the tenant on a lease for a term of at least one year, which is renewable for terms that are a minimum of one month long and is terminable only for cause. (Refer to Exhibit 48-b, page 220-225)

262.     24 CFR § 578.7. **Responsibilities of the Continuum of Care.**

(a) Operate the Continuum of Care. The Continuum of Care must:

        (1) Hold meetings of the full membership, with published agendas, at least semiannually;

(2) Make an invitation for new members to join publicly available within the geographic at least annually;

(3) Adopt and follow a written process to select a board to act on behalf of the Continuum of Care.  The process must be reviewed, updated, and approved by the Continuum at least once every 5 years;

(4) Appoint additional committees, subcommittees, or workgroups;

(5) In consultation with the collaborative applicant and the HMIS Lead, develop, follow, and update annually a governance charter, which will include all procedures and policies needed to comply with subpart B of this part and with HMIS requirements as prescribed by HUD; and a code of conduct and recusal process for the board, its chair(s), and any person acting on behalf of the board;

(6) Consult with recipients and subrecipients to establish performance targets appropriate for population and program type, monitor recipient and subrecipient performance, evaluate outcomes, and take action against poor performers;

(7) Evaluate outcomes of projects funded under the Emergency Solutions Grants program and the Continuum of Care program, and report to HUD;

(8) In consultation with recipients of Emergency Solutions Grants program funds within the geographic area, establish, and operate either a centralized or coordinated assessment system that provides an initial, comprehensive assessment of the needs of individuals and families for housing and services. The Continuum must develop a specific policy to guide the operation of the centralized or coordinated assessment system on how its system will address the needs of individuals and families who are fleeing, or attempting to flee, domestic violence, dating violence, sexual assault, or stalking, but who are seeking shelter or services from nonvictim service providers.   This system must comply with any requirements established by HUD by Notice.

(9) In consultation with recipients of Emergency Solutions Grants program funds within the geographic area, establish, and consistently follow written standards for providing Continuum of Care assistance. At a minimum, these written standards must include:

(i)   Policies and procedures for evaluating individuals 'and families 'eligibility for assistance under this part;

(ii) Policies and procedures for determining and prioritizing which eligible individuals and families will receive transitional housing assistance;

(iii) Policies and procedures for determining and prioritizing which eligible individuals and families will receive rapid rehousing assistance;

(iv) Standards for determining what percentage or amount of rent each program participant must pay while receiving rapid rehousing assistance;

(v) Policies and procedures for determining and prioritizing which eligible individuals and families will receive permanent supportive housing assistance; and

(vi) Where the Continuum is designated a high-performing community, as described in subpart G of this part, policies and procedures set forth in 24 CFR 576.400(e)(3)(vi), (e)(3)(vii), (e)(3)(viii), and (e)(3)(ix).

263.     **(b) Designating and operating an HMIS.**

The Continuum of Care must:

(1) Designate a single Homeless Management Information System (HMIS) for the geographic area;

(2) Designate an eligible applicant to manage the Continuum HMIS, which will be known as the HMIS Lead;

(3) Review, revise, and approve a privacy plan, security plan, and data quality plan for the HMIS.

(4) Ensure consistent participation of recipients and subrecipients in the HMIS; and

(5) Ensure the HMIS is administered in compliance with requirements prescribed by HUD.

(b) Designating and operating an HMIS. The Continuum of Care must:

(1) Designate a single Homeless Management Information System (HMIS) for the geographic area;

(2) Designate an eligible applicant to manage the Continuum's HMIS, which will be known as the HMIS Lead;

(3) Review, revise, and approve a privacy plan, security plan, and data quality plan for the HMIS.

(4) Ensure consistent participation of recipients and subrecipients in the HMIS; and

(5) Ensure the HMIS is administered in compliance with requirements prescribed by HUD.

264.    -(c) Continuum of Care planning. The Continuum must develop a plan that includes:

(1) Coordinating the implementation of a housing and service system within its geographic area that meets the needs of the homeless individuals (including unaccompanied youth) and families. At a minimum, such system encompasses the following:

(i) Outreach, engagement, and assessment;

(ii) Shelter, housing, and supportive services;

(iii) Prevention strategies.

(2) Planning for and conducting, at least biennially, a point-in-time count of homeless persons within the geographic area that meets the following requirements:

(i) Homeless persons who are living in a place not designed or ordinarily used as a regular sleeping accommodation for humans must be counted as unsheltered homeless persons.

(ii) Persons living in emergency shelters and transitional housing projects must be counted as sheltered homeless persons.

(iii) Other requirements established by HUD by Notice.

(3) Conducting an annual gaps analysis of the homeless needs and services available within the geographic area;

(4) Providing information required to complete the Consolidated Plan(s) within the Continuum's geographic area;

(5) Consulting with State and local government Emergency Solutions Grants program recipients within the Continuum's geographic area on the plan for allocating Emergency Solutions Grants program funds and reporting on and evaluating the performance of Emergency Solutions Grants program recipients and subrecipients.

265.    **(d) VAWA emergency transfer plan.**

The Continuum of Care must develop the emergency transfer plan for the Continuum of Care that meets the requirements under § 578.99(j)(8).

[77 FR 45442, July 31, 2012, as amended at 81 FR 80809, Nov. 16, 2016]

(Refer to Exhibit 48-c, pages 226-228)

---

### COUNT I: DISCRIMINATION

266.    Defendant(s), AEON Management, LLC, AEON Property Management, Defendant, Crane Ordway Limited Partnership dBA Crane Ordway Apartments, and Corinna Lowe, in her individual and official capacity as the Supervisor and Portfolio Director of the Crane Ordway Apartments, and Jamal Abdirahman, in his individual and capacity as Site Manager of the Crane Ordway Apartments have violated the rights of Plaintiff, a Black African American and engaged in a pattern or practice of racial discrimination collaborating with other white tenants by: Subjecting him to harsher violations for fabricated light infractions compared to more serious criminal infractions committed by white tenants including defendants listed in this complaint with no violations or reprimands or records kept of actual police involvement.

267.     Defendant(s), AEON Management, LLC, AEON Property Management, Defendant, Crane Ordway Apartments, Crane Ordway Limited Partnership, Marsha Lidgerding, in her individual and official capacity as the onsite Leasing Manager of the Aeon Crane Ordway Apartments, and Colin Burkholder, in his individual and capacity as Assistant Site Manager of the Aeon Crane Ordway Apartments have violated the rights of Plaintiff, a Black African American and engaged in a pattern and practice of racial discrimination by: Intentionally skipping over Plaintiff and other minorities who applied weeks and months before white applicants. Placing white applicants in the units they initially showed Plaintiff with nicer, larger square foot studios and apartments, while placing Plaintiff and other minorities in smaller units the size of efficiencies.

268.     Billing and charging subsidies and rent to the (MHFA) Minnesota Housing Finance Agency who appropriates and funds the Long-Term Homelessness program, also known as the HTF/ELHIF program at the same rate for minorities with smaller units than those white tenants with larger nicer units. MHFA is one of the lead agencies dealing with the State of Minnesota's homelessness.

269.     Failing to do repairs on units occupied by Plaintiff, while repairing units occupied by white tenants. During the whole summer of 2017, Plaintiff's air conditioning was never repaired while Defendants Et al. repaired all the white

tenant's A/C units knowing that without repairs of the AC unit temperatures would rise from 90 to sometimes over 100 degrees.

270.        In violation of 24 CFR § 578.7 The Continuum of Care, Defendant (s), AEON Management LLC, AEON Property Management, Defendant, Crane Ordway Limited Partnership dBA Crane Ordway Apartments, were required by the State of Minnesota, HUD, and the U.S Federal Government-CODE OF FEDERAL REGULATIONS (24 CFR), which all are govern by U.S. Federal Law, FAILED with intent to ensure that all Plaintiff's data, information, documents, signed information disclosure forms, certification and re-certification worksheets and forms,  services provided, program Plaintiff was placed in, and all other relevant information acquired pertaining to Plaintiff  was NOT entered into the applicable community-wide CES/HMIS database in the geographical  region Plaintiff resided, causing intentional injury, undue hardship, and forced Plaintiff back into homelessness.

270-a        U.S. Department of Housing Urban Development describes Permanent housing (PH) is defined as community-based housing without a designated length of stay in which formerly homeless individuals and families live as independently as possible. Under PH, a program participant must be the tenant on a lease (or sublease) for an initial term of at least one year that is renewable and is terminable only for cause. Further, leases (or subleases) must be renewable for a minimum term of one month.

270-b      The CoC Program funds two types of permanent housing: permanent supportive housing (PSH) for persons with disabilities and rapid re-housing. Permanent supportive housing is permanent housing with indefinite leasing or rental assistance paired with supportive services to assist homeless persons with a disability or families with an adult or child member with a disability achieve housing stability. Rapid re-housing (RRH) emphasizes housing search and relocation services and short- and medium-term rental assistance to move homeless persons and families (with or without a disability) as rapidly as possible into permanent housing. Aeon, et al., made sure that all white tenants were recertified, despite the facts that they had the most police involvement.

270-b      to become eligible in PH-Permanent Housing, a program participant must be the tenant on a lease (or sublease) for an initial term of at least one year that is renewable and is terminable only for cause. Defendants were involved in a premeditated conspiracy to intentionally deprive Plaintiff of his rights from reaching the threshold of one year, under bogus fabricated charges, and pretenses. Defendants knew that by denying Plaintiff Recertification status with HUD, Defendants knew that he would be forced back into the emergency shelter.

270-c      Defendants intentionally violated all or in part 24 CFR part 576 whereas when they declined to adhere when it came to HUD's requirements pertaining to "Homelessness Prevention." Defendants purposely concealed and hid pertinent data

and information to finalize the last most punishing blow, causing a TKO knockout blow to Plaintiff. To Plaintiff's knowledge, there is no record or even an event of Plaintiff's participation in any program sponsored by HUD. In addition, CoC's are required by statue to keep the Recipients (Rand subrecipients located in HUD-designated High Performing Communities (HPCs) may use CoC Program funds for homelessness prevention assistance for individuals and families at risk of homelessness. The services under this component may include housing relocation and stabilization services as well as short- and medium-term rental assistance to prevent an individual or family from becoming homeless. Through this component, recipients and subrecipients may help individuals and families at-risk of homelessness to maintain their existing housing or transition to new permanent housing. Homelessness prevention must be administered in accordance with 24 CFR part 576. (Refer to Supplemental Exhibit 5 - 17)


271.        As statement of equal rights guaranteed in our constitution 42 U.S. Code § 1981 - Equal rights under the law, Aeon, et al., Denied Plaintiff of equal rights under the law that all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

272.     The facts show, just from the Saint Paul Police reports, and alleged lease violations that Plaintiff was not subjected to the same-like punishment, pain, penalties, etc., as those that were whites at the Crane Ordway apartments. Despite their more serious infractions they committed, including indiscretions they commit on a daily basis to this day, still enjoy proceedings, security of persons and property, enjoyed by white citizens.

## COUNT II: HARASSMENT

273.     Defendant(s), Defendant, AEON Management, LLC, AEON Property Management, Defendant, Crane Ordway Apartments, Crane Ordway Limited Partnership, Scott Redd, in his individual and capacity as , AEON Vice President of Resident connections, and supportive services, of the Aeon Crane Ordway Apartments and Corinna Lowe, in her individual and official capacity as the Supervisor and Portfolio Director of the Crane Ordway Apartments, and Jamal Abdirahman, in his individual and capacity as Site Manager of the Aeon Crane Ordway Apartments and EPG Security Group, Et al, violated the rights of Plaintiff, a Black African American in which defendants engaged in a pattern or practice of racial discrimination and extreme harassment, collaboration along with other white tenants named in this civil action, to stalk, follow, spy on, use electronic devices such as surveillance and surveillance cameras,  and failed or refused to take adequate

action to prevent, stop or correct the racial disparity, harassment and discrimination suffered by Plaintiff. .`

274.    When Plaintiff complained of racial harassment and discrimination, Plaintiff was subjected to coercion, intimidation and/or including but not limited to eviction and initiating unwarranted eviction actions.

275.    Plaintiff was never notified by any of the Defendant (s) that the racial harassment, coercion, and intimidation had been addressed and that it would stop, and that racial harassment, discrimination and/or retaliation would not be tolerated on Aeon Property Management property. Instead, it got worst by all parties named in this suit.

276.    As set forth above, Defendants' statements, actions, and failure to act, including the maintenance of policies intended to discriminate against African-Americans, constitute:

(a) A pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, 42 U.S.C. § 3601-3619; and

(b) A denial to a group of persons of rights granted by the Fair Housing Act, 42 U.S.C. § 3601-3619, which raises an issue of general public importance.

Defendants, by their statements, actions, and failure to act, as set forth above, have:

> (a) Refused to rent, refused to negotiate for the rental of, or otherwise made unavailable, dwellings because of race or color, in violation of 42 U.S.C. § 3604(a);

> (b) Discriminated in the terms, conditions, or privileges of the rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or color, in violation of 42 U.S.C. § 3604(b);

> (c) Made statements with respect to the rental of dwellings that indicate a preference, limitation, or discrimination based on race or color, or an intention to make such preference, limitation, or discrimination, in violation of 42 U.S.C. § 3604(c); and

> (d) Coerced, intimidated, threatened, and interfered with Plaintiff in the exercise and enjoyment of, (while they received federal government grant funds) or on account of his having exercised or enjoyed, his rights under the Fair Housing Act, in violation of 42 U.S.C. § 3616 (a) & 3617.

277.     Plaintiff who has been the victim of Defendants' racial harassment, discrimination and retaliation and is an aggrieved person, as defined by 42 U.S.C. §

3602(i), and have suffered harm and incurred damages as a result of Defendants' discriminatory housing practices.

278.        Defendants' discriminatory actions were intentional, willful, and taken in total disregard for the rights of Plaintiff, and perhaps other African-American applicants and tenants who were subjected to Defendants' discriminatory housing practices.

## COUNT III: RETALIATION

279.        Defendant(s,) Aeon Property Management, Et al, were willing participants in  coercing, intimidating, threatening, and  interfering with Plaintiff, in the exercise and enjoyment of all  right granted and protected by the Fair Housing Act; Awards such  damages as would fully compensate Plaintiff, a   victim of Defendants' discriminatory housing practices for injuries suffered as a result of Defendants' discriminatory conduct, pursuant to 42 U.S.C. ï½§ 3614(d)(1)(B); subjecting Plaintiff, a  tenant to different terms and conditions in the rental of Crane Ordway apartments; tolerating and/or failing to protect Plaintiff, a African-American tenants from racial harassment and discrimination; and coercing, intimidating, threatening and interfering with Plaintiff, an African-American tenant in the exercise or enjoyment of rights granted and protected by the Fair Housing Act.

## COUNT IV: DAFAMATION/SLANDER/LIBEL

280.      The elements of a common-law defamation action are well settled. For a statement to be considered defamatory it must be:

1) communicated to someone other than the plaintiff,

2) it must be false, and

3) it must tend to harm the plaintiff's reputation and to lower him in the estimation of the community. *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919 (Minn. 2009).

281.      Defamation affecting the plaintiff in his business, trade, profession, office, or calling are defamatory per se and thus actionable without any proof of actual damages. Anderson v. Kammeier, 262 N.W.2d 366, 372 (Minn. 1977). Defamatory per se defines a rule of damages, not of defamatory meaning." Schlieman v. Gannett Minn. Broad., Inc., 637 N.W.2d 297, 307 (Minn. App. 2001).

282.      Plaintiff has shown evidence of four elements necessary to recover in a libel or slander suit; that the defendant conveyed a defamatory message; that the material was published; meaning that it was conveyed to someone other than the

plaintiff; that the plaintiff could be identified as the person referred to in the defamatory material; and that the plaintiff suffered injury to his reputation as a result of the communication.

---

## UNDUE HARDSHIP

283.     Because of Defendant (s) discriminatory patterns and practices, Plaintiff have suffered and had to:

1. Sleep on light rail trains until Metro Police put all transits off which is at 2:00 am.

2. Walking aimlessly on the streets freezing all night in the cold until public transportation starts up again in the wintertime during February through April 2018.

3. Starving most days because Plaintiff had no money to buy food.

4. No money for Public Transportation to get to emergency help facilities.

5. Forfeit all my possessions because Plaintiff had no money to afford storage for his possessions such as furniture; clothes; family pictures and important papers, etc.

6. Wearing the same clothes for days because Plaintiff had no place to wash the clothes on his back.

7. Endure the smell of urine on his clothes which became filthy because Plaintiff does not have access to cleaning facilities.

8. Sleeping in chairs where ever Plaintiff could, like the library, hospitals, Union Depot, trains, buses, vacant houses,

9. Denied access to shelters because St. Olaf who took over responsibilities from the Hennepin County Social Services and who is now the centralized placement center for emergency housing for the homeless in the Twin Cities are a group of incompetents over paid idiots who provides incorrect information to homeless people such as Plaintiff to shelters like Salvation Harbor Lights and Higher Ground who have no record of any reservations for a bed or matt to sleep in.

10. Robbed, beaten, and assaulted.

11. Personal property taken or stolen by criminal predators on the streets and trains.

12. Disowned by children and family because they believed that Plaintiff was evicted because of drug use and not what Plaintiff had explained to them that he was a victim of harassment, retaliation, and discrimination.

13. Humiliation, disgrace, despair, shame, hopelessness, suicide, chronic mental and physical anguish from this traumatic situation perpetrated by evil no caring individuals.

14. Sickness and ailments.

## RELIEF:

**WHEREFORE,** Plaintiff respectfully prays for entry of judgment and an order providing:

1.      That Defendants, AEON Management, LLC, AEON Property Management, Crane Ordway Apartments, Crane Ordway Limited Partnership pay Compensatory and Special damages to Plaintiff in the amount of $500,000.00

2.      That EPG Security Group pay Compensatory and Special damages to Plaintiff in the amount of $250,000.00

3.      That Defendants, AEON Management, LLC, AEON Property Management, Crane Ordway Apartments, Crane Ordway Limited Partnership pay Punitive damages to Plaintiff in the amount of $50,000,000.00.

4.      That EPG Security Group pay Punitive damages to Plaintiff in the amount of $500,000.00.

5.      Plaintiff be rehoused immediately as provided in the rules of U.S. HUD.


        and, all other remedies plus costs, disbursements, reasonable attorney's fees, interest, and whatever other relief the Court deems just and equitable.

8/20/18
_____
Date

Respectfully submitted,

Warren F. Nelson *Pro Se*
Salvation Army
    Emergency Shelter
Harbor Lights
1010 Currie Ave, 2nd Flr
Minneapolis, MN 55403
763-453-8675
warrennelsonjr@gmail.com

cc:

AEON Management, LLC,
AEON Property Management,
Crane Ordway Apartments,
Crane Ordway Limited Partnership, Et al.
901 North 3rd Street, Suite 150
Minneapolis, MN 55401

EPG Security Group, Et al.
2928 North 2nd Street,
Minneapolis, Minnesota 55411

### ACKNOWLEDGMENT

The undersigned hereby acknowledges that sanctions, including costs, disbursements, and reasonable attorney fees, may be awarded pursuant to Minn. Stat. § 549.211 to the party against whom the allegations in this pleading are asserted.